**Connell Foley LLP**
56 Livingston Avenue
Roseland, New Jersey 07068
973-535-0500
Attorneys for Plaintiffs, Travelodge Hotels, Inc. and Wyndham Hotel Group, LLC

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TRAVELODGE HOTELS, INC., a Delaware Corporation; and WYNDHAM HOTEL GROUP, LLC, a Delaware Limited Liability Company, <br><br> Plaintiffs, <br><br> v. <br><br> COVINGTON RE, LLC, a Louisiana Limited Liability Company; and BHAGIRATH JOSHI, an individual, <br><br> Defendants. | Civil Action No. 26-cv-05957 <br><br><br><br> **COMPLAINT** |

Plaintiffs Travelodge Hotels, Inc. and Wyndham Hotel Group, LLC, by their attorneys, Connell Foley LLP, complaining of defendants, Covington RE, LLC and Bhagirath Joshi, say:

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Travelodge Hotels, Inc. ("THI") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.      Plaintiff Wyndham Hotel Group, LLC ("WHG") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

18223031-2

3.      Wyndham Hotels & Resorts, Inc. is the sole member of WHG and is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

4.      Defendant Covington RE, LLC ("Covington"), on information and belief, is a limited liability company organized and existing under the laws of the State of Louisiana, with its principal place of business at 2605 South Range Avenue, Denham Springs, Louisiana 70726.

5.      Defendant Bhagirath Joshi ("Joshi"), on information and belief, is a member of Covington and a citizen of the State of Louisiana, having an address at 23911 Terrace Avenue, Denham Springs, Louisiana 70726.

6.      Alaknanda Joshi, on information and belief, is a member of Covington and a citizen of the State of Louisiana, having an address at 23911 Terrace Avenue, Denham Springs, Louisiana 70726.

7.      Upon information and belief, Joshi and Alaknanda Joshi are the only constituent members of Covington.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all of the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

9.      This Court has personal jurisdiction over Covington by virtue of, among other things, section 17.6.3 of the December 21, 2020 franchise agreement by and between Covington and THI (the "Franchise Agreement"), described in more detail below, pursuant to which Covington has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

2

18223031-2

10. This Court has personal jurisdiction over Joshi by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Joshi acknowledged that he was personally bound by section 17 of the Franchise Agreement.

11. Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Covington of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

12. On or about December 21, 2020, THI entered into the Franchise Agreement with Covington for the operation of a 46-room Travelodge® guest lodging facility located at 2311 Home Depot Drive, Denham Springs, Louisiana 70726, designated as Site No. 55072-16502-02 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as Exhibit A.

13. On or about December 21, 2020, THI and Covington entered into a SynXis Subscription Agreement (the "SynXis Agreement"), which governed Covington's access to and use of certain computer programs, applications, features, and services, as well as any and all modifications, corrections, updates, and enhancements to same. A true copy of the SynXis Agreement is attached hereto as Exhibit B.

14. On or about December 21, 2020, WHG and Covington entered into a Signature Reservation Services Agreement (the "SRS Agreement"), pursuant to which WHG provided Covington the option to utilize the services of reservation agents to handle calls from guest seeking to make reservations at the Facility. A true copy of the SRS Agreement is attached hereto as Exhibit C.

18223031-2

15.     Pursuant to section 5 of the Franchise Agreement, Covington was obligated to operate a Travelodge® guest lodging facility for a fifteen-year term.

16.     Pursuant to section 7, section 18.1, and Schedule C of the Franchise Agreement, section 5 of the SynXis Agreement, and section 1 and related schedules of the SRS Agreement, Covington was required to make certain periodic payments to THI for royalties, system assessment fees, SynXis Fees, SRS Fees, taxes, interest, and other fees (collectively, "Recurring Fees").

17.     Pursuant to section 7.3 of the Franchise Agreement, Covington agreed that interest is payable "on any past due amount payable to [THI] under this [Franchise] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

18.     Pursuant to section 3.6.4 of the Franchise Agreement, Covington was required to prepare and submit monthly reports to THI disclosing, among other things, the amount of gross room revenue earned by Covington at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to THI.

19.     Pursuant to section 3.6 of the Franchise Agreement, Covington agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Covington agreed to allow THI to examine, audit, and make copies of the entries in these books, records, and accounts.

20.     Pursuant to section 11.2 of the Franchise Agreement, THI could terminate the Franchise Agreement, with notice to Covington, if Covington: (a) discontinued operating the Facility as a Travelodge® guest lodging establishment, and/or (b) lost possession or the right to possession of the Facility.

4

21. Pursuant to section 12.1 of the Franchise Agreement, Covington agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to THI in accordance with a formula specified in the Franchise Agreement.

22. Section 12.1 of the Franchise Agreement specifically set liquidated damages for the Facility at "an amount equal to the average monthly accrued Recurring Fees during the immediately preceding 12 full calendar months multiplied by 24 (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of Termination, whichever is less)" or "[b]efore the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms that [Covington was] authorized to operate under Schedule B of this [Franchise] Agreement as of the Termination."

23. Pursuant to section 17.4 of the Franchise Agreement, Covington agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

24. Effective as of the date of the Franchise Agreement, Joshi provided THI with a Guaranty of Covington's obligations under the Franchise Agreement. A true copy of the Guaranty is attached hereto as Exhibit D.

25. Pursuant to the terms of the Guaranty, Joshi agreed, among other things, that upon a default under the Franchise Agreement, he would "immediately make each payment and perform or cause [Covington] to perform, each unpaid or unperformed obligation of [Covington] under the [Franchise] Agreement."

18223031-2

26.     Pursuant to the terms of the Guaranty, Joshi agreed to pay the costs, including reasonable attorneys' fees, incurred by THI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

**The Defendants' Premature Termination of the Franchise Agreement**

27.     On or about August 5, 2024, Covington unilaterally terminated the Franchise Agreement by ceasing to operate the Facility as a Travelodge® guest lodging facility.

28.     By letter dated August 19, 2024, a true copy of which is attached as Exhibit E, THI acknowledged the termination of the Franchise Agreement, and advised Covington that it was required to pay to THI as liquidated damages for premature termination the sum of $92,000.00 as required under section 12.1 of the Franchise Agreement, and all outstanding Recurring Fees through the date of termination.

29.     Plaintiffs have satisfied all of its obligations under the Franchise Agreement, the SynXis Agreement, and the SRS Agreement, including without limitation, providing Covington the right to use the Travelodge® trade name, trademarks, and service marks.

**FIRST COUNT**

30.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 29 of the Complaint.

31.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Covington agreed to allow THI to examine, audit, and make copies of Covington's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

32.     The calculation of the monetary amounts sought by THI in this action is based on the gross room revenue information supplied to THI by Covington and, to the extent there has been non-reporting, THI's estimate as to the gross room revenue earned by Covington.

6

18223031-2

33. The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Covington.

**WHEREFORE**, THI demands judgment ordering that Covington account to THI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

## SECOND COUNT

34. THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 33 of the Complaint.

35. On August 5, 2024, Covington unilaterally terminated the Franchise Agreement by ceasing to operate the Facility as a Travelodge® guest lodging facility.

36. Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to the action of the Franchisee, Covington shall pay liquidated damages to THI within ten (10) days of the date of termination.

37. As a result of the termination of the Franchise Agreement, Covington is obligated to pay THI liquidated damages in the amount of $92,000.00, as calculated pursuant to section 12.1 of the Franchise Agreement.

38. Notwithstanding THI's demand for payment, Covington has failed to pay THI the liquidated damages as required in section 12.1 of the Franchise Agreement.

39. THI has been damaged by Covington's failure to pay liquidated damages.

**WHEREFORE**, THI demands judgment against Covington for liquidated damages in the amount of $92,000.00, together with interest, attorneys' fees, and costs of suit.

18223031-2

**THIRD COUNT**

40.     THI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.     By virtue of the premature termination of the Franchise Agreement, THI sustained a loss of future revenue over the remainder of the fifteen-year term of the Franchise Agreement.

42.     If the Court determines that Covington is not liable to pay THI liquidated damages as required by section 12.1 of the Franchise Agreement then, in the alternative, Covington is liable to THI for actual damages for the premature termination of the Franchise Agreement.

43.     THI has been damaged by Covington's breach of its obligation to operate a Travelodge® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, THI demands judgment against Covington for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

**FOURTH COUNT**

44.     Plaintiffs repeat and make a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.     Pursuant to section 7, section 18.1, and Schedule C of the Franchise Agreement, section 5 of the SynXis Agreement, and section 1 and related schedules of the SRS Agreement, Covington was obligated to remit Recurring Fees to Plaintiffs.

46.     Despite its obligation to do so, Covington failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement, SynXis Agreement, and the SRS Agreement, in the current amount of $5,542.14.

47.     Covington's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement, SynXis Agreement, and SRS Agreement and has damaged Plaintiffs.

8

18223031-2

**WHEREFORE**, Plaintiffs demand judgment against Covington for the outstanding Recurring Fees due and owing under the Franchise Agreement, the SynXis Agreement, and the SRS Agreement, in the current amount of $5,542.14, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

48.     Plaintiffs repeat and make a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.     Covington utilized Plaintiffs services, trade names, trademarks, and service marks to earn revenue at the Facility.

50.     Covington did not adequately compensate Plaintiffs for the use of their services, trade names, trademarks, and service marks to earn revenue at the Facility.

51.     Covington's failure to compensate Plaintiffs constitutes unjust enrichment and has damaged Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against Covington for an amount equal to the value of services provided by Plaintiffs to Covington, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

52.     Plaintiffs repeat and make a part hereof each and every allegation contained in paragraphs 1 through 51 of the Complaint.

53.     Pursuant to the terms of the Guaranty, Joshi agreed, among other things, that upon a default under the Franchise Agreement, SynXis Agreement, and the SRS Agreement, he would immediately make each payment and perform each obligation required of Covington under the Franchise Agreement, SynXis Agreement, and the SRS Agreement.

9

18223031-2

54.    Despite his obligation to do so, Joshi has failed to make any payments or perform or cause Covington to perform each obligation required under the Franchise Agreement, SynXis Agreement, and the SRS Agreement.

55.    Pursuant to the Guaranty, Joshi is liable to THI for Covington's liquidated damages in the amount of $92,000.00, or actual damages in an amount to be determined at trial, and Covington's Recurring Fees due and owing to Plaintiffs under the Franchise Agreement, SynXis Agreement, and the SRS Agreement, in the current amount of $5,542.14.

**WHEREFORE**, Plaintiffs demand judgment against Joshi for damages in the amount of all liquidated damages or actual damages and outstanding Recurring Fees due and owing under the Franchise Agreement, SynXis Agreement, SRS Agreement, and the Guaranty together with interest, attorneys' fees, and costs of suit.

**Connell Foley LLP**
Attorneys for Plaintiffs,
Travelodge Hotels, Inc. and
Wyndham Hotel Group, LLC

By:_____
        **BRYAN P. COUCH**

Dated:  May 26, 2026

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

**Connell Foley LLP**
Attorneys for Plaintiffs,
Travelodge Hotels, Inc. and
Wyndham Hotel Group, LLC

By:_____
        **BRYAN P. COUCH**

Dated:  May 26, 2026

18223031-2

# EXHIBIT A

Location: **Denham Springs, LA**
Entity No.: **16502-02**
Unit No.: **55072**

## TRAVELODGE HOTELS, INC.
## FRANCHISE AGREEMENT

THIS Franchise AGREEMENT ("Agreement"), dated <u>December 21</u>, 20<u>20</u>, is between TRAVELODGE HOTELS, INC., a Delaware corporation ("we", "our" or "us"), and COVINGTON RE LLC, a Louisiana limited liability company ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. Franchise.** We have the exclusive right to franchise to you the distinctive "Travelodge" System for providing transient guest lodging services. We grant to you and you accept the Franchise, effective and beginning on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Travelodge Inn" or a "Travelodge Inn & Suites by Wyndham." You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. Protected Territory.** We will not own, operate, lease, manage, franchise or license any party but you to operate a Chain Facility in the "Protected Territory", as defined below, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you, any of your affiliates, nor any of your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. You acknowledge that the Protected Territory fairly represents the Facility's trading area, and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section. You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential

1

TRA EX-C1
Q1/20

effect of the proposed Chain Facility on the Facility or its performance.  You further acknowledge and agree that notwithstanding the foregoing, we may operate, lease, manage, or license any other party to operate a Chain Facility in the Protected Territory beginning (a) six months prior to the expiration of this Agreement, or (b) as of the date that a date for the premature termination of this Agreement has been confirmed in writing by us. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.   The Protected Territory means all the area within a circle created by a two and one-half (2.5) mile radius whose center point is the front door of the Facility.

### 3.   Your Improvement and Operating Obligations.

3.1 **Pre-Opening Improvements.**  You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

3.2 **Operation.**

3.2.1    You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those required by System Standards or as specified on the Punch List) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards.  You will keep the Facility in a clean, neat, and sanitary condition.  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards.

3.2.2    The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities.  If the Facility is managed by a management company, the management agreement between you and the management company for the Facility shall be subject and subordinate to this Agreement and in the event of any conflict between the management agreement and this Agreement, the controlling contract shall be this Agreement. The management agreement shall not release you of any obligations set forth in this Agreement.

3.2.3    The Facility will accept payment from guests by all credit and debit cards or other forms of payment we designate in the System Standards Manual.  The Facility will comply with the Payment Card Industry Data Security Standard (PCI DSS) concerning cardholder information, as well as applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose.

3.2.4    You may add to or discontinue the amenities, services and facilities as required by System Standards or as specified on the Punch List, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay.  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.  You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

TRA EX-C1
Q1/20

3.2.5   Upon our reasonable request, you will provide us with then-current copies of the documents evidencing your ownership of, or right to possess, the Facility and/or the real property upon which the Facility is located, and a complete and accurate list of all of your owners and their Equity Interests.

3.3 **Training.**   You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees and general managers, respectively.  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement.  You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.4 **Marketing.**

3.4.1    You will participate in System marketing programs, including the Chain Websites if any, the Reservation System, and guest loyalty programs.  You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System.  You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants.  You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards.  You may implement, at your option and expense, your own local advertising.  Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication.  You will stop using any non-conforming, outdated or misleading advertising materials if we so request.

3.4.2    You will participate in any supplemental marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area or in a similar market segment.  We may assist the cooperative collect contributions.  You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.4.3   The Facility must participate in all mandatory Internet and distribution marketing activities and programs in accordance with the System Standards Manual, including any arrangements we make with third party distribution channels. You must provide us with information about the Facility and use our approved photographer for taking photographs of the Facility for posting on the Chain Websites, third party travel websites and various marketing media. The content you provide us or use yourself for any Internet or distribution marketing activities must be true, correct and accurate, and you will promptly notify us in writing, in accordance with our processes that are then in effect, when any correction to the content becomes necessary.  You must promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards.  You will discontinue any Internet or distribution marketing activities that conflict, in our reasonable discretion, with Chain-wide Internet or distribution

TRA EX-C1
Q1/20

marketing activities.  You must honor the terms of any participation agreement you sign for Internet or distribution marketing activities.  You will pay when due any fees, commissions, charges and reimbursements relating to Internet or distribution marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis.  We may suspend the Facility's participation in Internet or distribution marketing activities if you default under this Agreement.

3.4.4   You will participate in the Wyndham Rewards program or any successor guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C. The Wyndham Rewards Front Desk Guide sets forth additional standards, which you agree to follow.  The Front Desk Guide, including fees assessed and reimbursements rates, may be revised by us or our affiliates at any time upon thirty (30) days' prior notice.

3.4.5   As a requirement of your participation in the Reservation System, you must participate in our Signature Reservation Services ("SRS") program during the Term of the Agreement. Under the SRS program, you will pay the fees associated with certain calls answered by our agents on behalf of the Facility. The program terms and fees associated with the program are described in the SRS agreement that you will sign and deliver to us at the same time as you sign this Agreement.

3.5 **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote.  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6 **Financial Books & Records; Audits.**

3.6.1   The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Lodging Association, as modified by this Agreement and System Standards.  You acknowledge that your accurate and timely accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.6.2   Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards.  We may notify you of a date on which we propose to audit the Facility's books and records at the Facility but such notice is not required. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date.  You need to inform us where the books and records will be produced. You need to produce for

4

TRA EX-C1
Q1/20

our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility.  We may require access to the property including guest rooms. We may also perform an audit of the Facility's books and records remotely or electronically without advance notice or your knowledge.  Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3   We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section  3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors  during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit.  Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice."  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.  You must also pay any deficiency in Recurring Fees, any Audit Fee, as defined in Section 4.8, we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit.

3.6.4   You will, at your expense, prepare and submit to us by the third day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenues and such other data or information as we may require.  You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time.

3.7 **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement.   You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice.  The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the representative performing the inspection.  If the Facility fails an inspection, you refuse to cooperate with our representative, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our representative incurs for a reinspection.  You will also be charged the Reinspection Fee if we must return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also include the results of paper and electronic customer satisfaction

5

surveys of your guests as well as unsolicited feedback received from your guests in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys.   We may, at our discretion, implement a Chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable third party.  You must provide free lodging for the inspector(s) when he/she visits your Facility.

3.8 **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the System Standards Manual.  Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Travelodge Hotels, Inc., Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and their current and former subsidiaries, affiliates, successors and assigns as their interests may appear.  All policies must be primary and non-contributory with or excess of any insurance coverage that may be available to an additional insured.  You must submit to us, annually, a copy of the certificate of or other evidence of renewal or extension of each such insurance policy as required by the System Standards.  If you fail to procure or maintain the required insurance, then we will have the right (without any obligation) to procure such insurance at your cost plus a reasonable fee.

3.9 **Conferences.**  You or your representative will attend each Chain conference and pay the Conference Registration Fee.  The Chain conference may be held as part of a Wyndham Hotel Group, LLC multi-brand conference with special sessions and programs for our Chain only. Mandatory recurrent training for franchisees and general managers described in Section 4.1.4 may be held at a Chain conference.  The Fee will be the same for all Chain Facilities that we franchise in the United States.  We will invoice and charge you for the Conference Fee even if you do not attend the Chain Conference.  You will receive reasonable notice of a Chain conference.

3.10    **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve.  You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.11    **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Travelodge", "Thriftlodge" or "Travelodge by Wyndham", as applicable, and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System.  You agree that, in event that you or any of your principals or Guarantors is or is discovered to have been, convicted of a felony or any other offense likely to reflect adversely upon us, the System or the Marks, such conviction is a material, incurable breach of this Section. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.  You will participate in good faith in Chain-wide guest service and satisfaction guarantee programs we require for all Chain Facilities.  You shall use your best efforts to promote usage of other Chain Facilities by members of the public. Without our prior written consent, which may be withheld in our sole discretion, you shall ensure that no part of the Facility or the System is used to further or promote a different or competing business, including without limitation,

6

TRA EX-C1
Q1/20

advertising or promotion for guest lodging facilities other than those franchised by us or our affiliates and marketing, advertising or promoting any timeshare or vacation ownership resort not affiliated with us, our affiliates, or Wyndham Destinations, Inc. and its affiliates.

3.12    **Facility Modifications.**  You may not materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) until you receive our prior written consent, which we will not unreasonably withhold or delay.  You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility before you begin construction of any expansion.  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay.  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.13    **Courtesy Lodging.**  You will provide lodging at the "Employee Rate" established in the systems Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives and members of their immediate family.  You are not required to provide  more than two standard guest rooms at this rate on any given night.

3.14    **Minor Renovations.**  Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount.  You will perform the Minor Renovations as and when the Minor Renovation Notice requires.  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no less than 80% and the most recent quality assurance inspection score for the Facility was no less than 75% (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

3.15    **Technology Standards & Communications.**  You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment.  You must purchase the computer system and other equipment and software that we specify, including preventative maintenance software.  We may modify System Standards to require new or updated technology at all Chain Facilities.  At our request, you shall participate in any intranet or extranet system developed for use in connection with the System.  Such intranet or extranet system may be combined with that of our affiliates.  You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include,  among other things: (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system.  You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

7

TRA EX-C1
Q1/20

**4. <u>Our Operating and Service Obligations.</u>**  We will provide you with the following services and assistance:

4.1 **Training.**  We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager training, remedial training, re-certification training, and supplemental training.

4.1.1   **General Manager Training.**  We will offer at our corporate offices or at another location we designate training for your general manager in our Hospitality Management Program.  The program will not exceed two weeks in duration and will cover such topics as operating a Chain Facility, marketing and sales, financial management, guest services and people management.  We may administer certain diagnostic tests via the Internet to measure the skill set of your general manager and, based in part on his/her score, offer certain Internet-based training as a supplement to the classroom training experience.  Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date.  Any replacement general manager must complete the training program to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in the training program within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete the training even if you employ managers at other Chain Facilities who have already received this training.  We charge you tuition for training for your general manager in our Hospitality Management Program which is set forth on Schedule D.  If he/she does not attend the training within 90 days after the Opening Date, and for any replacement general manager, you must pay a separate tuition at the rate then in effect for the program when your manager attends the program. If you, or any other employee at the Facility,  wishes to attend the training, you can do so and you must pay the Additional Attendee Fee, currently $1,400, which is payable by the scheduled date for the program and is in addition to the tuition due for your general manager. We may charge you full or discounted tuition for "refresher" training for your general manager or for additional staff members who attend the training program with your general manager.  We will charge the then in effect discounted tuition for any additional staff members who attend the training program with your general manager.  You must also pay for your, your general manager and/or additional staff member's travel, lodging, meals, incidental expenses, compensation and benefits..

4.1.2   **Remedial Training.**  We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F score on quality assurance electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our customer care department or posted on third-party travel websites, distribution channels, blogs, social networks and other forums, as determined by us in our sole discretion.  This training may be offered at our corporate offices, at a regional location, on-line or at the Facility.  The training may be in the form of one or more classes held at different times and locations as we may require.  You must pay the tuition in effect for this program when it is offered to you.  If the training is provided at the Facility, you must provide lodging for our trainers.  In addition, if at the time of your quality assurance inspection, you receive (i) a failure rating on guest room cleanliness and (ii) an average quality assurance score of F on cleanliness of guestroom category or cleanliness of bathroom category (based on a

8

minimum of 10 electronic quality assurance guest surveys), then we may require you to take a one day, on-site remedial class on housekeeping within 60 days after the inspection.  The tuition for this an on-line class is currently $250, but is subject to increase in the future.  The fee for an on-site customer experience assessment or training class is currently $1,250, but is subject to increase in the future.

4.1.3    **Ongoing Training and Support.**  You must subscribe and pay an annual fee for access to our learning management system, Wyndham University, which includes training via live workshops, e-learning modules, webinars, online courses, videos and other educational resources, accessible by you and your staff via the Internet.  All general managers must complete recertification training at such intervals as we may establish in the System Standards Manual. You must pay us the tuition then in effect for the program. We may offer other mandatory or optional training programs for reasonable tuition or without charge.  Recertification and other supplemental training may be offered in our corporate offices or other locations or held in conjunction with a Chain lodging conference. You must pay the then current tuition for the training as well as for your representative's travel, lodging, meals, incidental expenses, compensation and benefits while attending the training.  We may offer, rent or sell to you other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.4    **No Show and Cancellation Fees.**  If you or your general manager, or any other member of your staff you designate, fails to register for a required training program within the required time period, or registers for a training program but fails to attend such program as scheduled without, notifying us in advance, whether such attendance is required or optional, we may charge you a No-show Fee of up to 100% of the tuition for the program.  If you, your general manager or any other member of your staff cancels participation in any training program less than seven (7) days before it is scheduled to be held, we may charge you a "cancellation fee" of up to 50% of the tuition for the program. No-show and cancellation fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program. We may assess you additional No-Show or Cancellation Fees for continued failures by you under this Section 4.1.

4.2 **Reservation System.**  We will operate and maintain (directly or by contracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion.  We will use Basic Reservation Fees we collect as part of the System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System.  We or our Approved Supplier will provide software maintenance and support for any software we or an Approved Supplier license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us, an affiliate or the supplier, as applicable. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation.  The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology. You shall own and be responsible for compliance with all applicable laws, regulations or standards concerning all Guest Information within your possession or any service provider holding such information on your behalf, and we shall own and be responsible for compliance

9

TRA EX-C1
Q1/20

with all applicable laws, regulations or standards concerning all Guest Information within our possession or any service provider holding such information on our behalf. To the extent that you and we both possess identical Guest Information, your and our respective ownership rights and related compliance obligations with regard to such Guest Information shall be separate and independent from one another. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

4.3 **Marketing.**

4.3.1    We will use Marketing Contributions we collect as part of the System Assessment Fees to promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities as we deem appropriate. We will determine in our discretion: (i) the nature and type of media placement; (ii) the allocation (if any) among international, national, regional and local markets; and (iii) the nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from collections of the Marketing Contributions to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2    We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) as we deem appropriate and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3    We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee.

4.4 **Purchasing and Other Services.** We may offer for a reasonable fee other optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation wherever it appears. We will not be liable to you for any expenses, losses or damages you may sustain as a result of any Mark addition, modification, substitution or discontinuation.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations

10

TRA EX-C1
Q1/20

under System Standards by telephone, mail, during any visits by our employees to the Facility, through the System Standards Manual, at training sessions and during conferences, meetings and visits we conduct.  We will provide telephone and mail consultation on Facility operation and marketing through our representatives.  We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement.  We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.**  We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium.  You will at all times comply with the System Standards.  You acknowledge that the System Standards and the System Standards Manual are designed to protect the System and the Marks, and not to control the day-to-day operation of your business.  We will provide you with access to the System Standards Manual promptly after we sign this Agreement.  We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

4.8 **Inspections and Audits.**   We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.7. In connection with the audit, you will pay us any understated amount plus interest under Section 3.6. If the understated amount is three percent (3%) or more of the total amount owed during a six month period, you will also pay us an "Audit Fee" equal to the costs and expenses associated with the audit.  Our inspections are solely for the purposes of checking compliance with System Standards.

4.9 **Revenue Management.**  We offer revenue management services ("RMS") for additional fees. RMS is currently offered at three levels of service each of which offers a different frequency of inventory management, strategic positioning, future demand strategy and targeted promotions and packages.  In addition to any required participation in RMS as described in Schedule D, we reserve the right to require you to participate in RMS at the same level as other similarly situated Chain Facilities (currently Diamond RMS) if the Facility does not have a dedicated, qualified revenue manager and (i) your hotel has 120 rooms or more, or (ii) we reasonably determine one is needed based on your hotel's occupancy or business mix. You are required to sign a Hotel Revenue Management Agreement for the applicable level of service as a requirement of your participation in RMS.

**5.  Term.**  The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the fifteenth (15th) Franchise Year. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.  However, if applicable law requires us to offer renewal rights, and you desire to renew this Agreement, then you will apply for a renewal franchise agreement at least six months, but not more than nine months, prior to the expiration date, and subject to such applicable law, you will have to meet our then-current

11

TRA EX-C1
Q1/20

requirements for applicants seeking a franchise agreement, which may include (i) executing our then-current form of license and other agreements, which license and other agreements may contain materially different terms and provisions (such as operating standards and fees) from those contained in this Agreement, (ii) executing a general release of us and our affiliates, in form and substance satisfactory to us, (iii) completing a property improvement plan, and (iv) paying a standard renewal fee, if then applicable.

**6.   Application and Initial Fees.**  You must pay us a non-refundable Application Fee of $1,500, which shall be applied to your Initial Fee or Relicense Fee.  If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee.  If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee.  The amount of your Initial Fee or Relicense Fee is $7,000, $1,500 of which shall be applied from your Application Fee, all of which shall be paid pursuant to the attached Initial Fee Note.

**7.   Recurring Fees, Taxes and Interest.**

7.1 You will pay us certain "Recurring Fees" each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States).  The Recurring Fees described in Section 7.1 are payable three days after the month in which they accrue, without billing or demand.  Other Recurring Fees are payable at the times set forth in the System Standards.  Recurring Fees include the following:

7.1.1    A "Royalty" equal to four and five-tenths percent (4.5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2    A "System Assessment Fee" as set forth in Schedule C including a "Marketing Contribution" and a "Daily Guest Room Charge" for advertising, marketing, training and other related services and programs, and a "Basic Reservation Fee" for the Reservation System, accrues from the Opening Date until the end of the Term, including during reservation suspension periods. We collect and deposit these Fees from franchisees, then disburse and administer the funds collected by means of a separate account or accounts.  We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services.  You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as commissions we pay to travel and other agents for certain reservation and marketing services to generate reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Chain Websites  and/or other reservation systems, distribution channels and networks, and fees for additional services and programs.  We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula.  We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C.

7.2 You will pay to us "taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes (collectively "Taxes") assessed against us on the Recurring Fees and

12

TRA EX-C1
Q1/20

basic charges by the jurisdictions where the Facility is located, but not including any income tax, franchise or other similar tax for the privilege of doing business by us in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

7.5 You will report and pay to us all Recurring Fees and other fees and charges on-line via our self-service electronic invoice presentment and payment tool accessible through our Chain intranet. In the electronic on-line environment, payments can be made either through the electronic check payment channel or the credit card payment channel. We reserve the right to change, from time to time, the technologies or other means for reporting and paying fees to us by amending the System Standards Manual.

## 8. **Indemnifications.**

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from

13

TRA EX-C1
Q1/20

and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.  You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.  You will cooperate with our defense and resolution of the claim.  We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

9.    **Your Assignments, Transfers and Conveyances.**

9.1 **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).  We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.  You may finance the Facility and grant a lien, security interest or encumbrance (but not in this Agreement) on it without notice to us or our consent.  If a Transfer is to occur, the transferee or you must comply with Section 9.3.  Your Franchise is subject to termination when the Transfer occurs.  The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility.  The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13.  You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise.  As a condition of our consent, if your interest in this Agreement is proposed as the collateral of a security interest, then we may require that you and your lender execute a comfort letter in the form described in our then-current disclosure document and that you pay our then-current fee for processing such a request.  Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Financing Documents.** Neither you, nor any of your Equity Interest owners, shall represent in any proposed financing arrangement to any proposed lender or participant in a private or public investment offering that we or any of our affiliates are or shall be in any way responsible for your obligations or financial projections, if any, set forth in such financing arrangement or investment offering or that we or any of our affiliates are or shall be participating in such private or public investment offering. In addition, any proposed financing arrangement where the service mark "Travelodge" appears, or a reference to this Agreement appears, shall contain a disclaimer in bold face type substantially as follows: THE BORROWER IS A PARTY TO AN AGREEMENT WITH TRAVELODGE HOTELS, INC. TO OPERATE HOTELS USING THE SERVICE MARK "TRAVELODGE."  NEITHER TRAVELODGE HOTELS, INC. NOR ITS AFFILIATES OWN ANY SUCH HOTELS OR ARE A PARTY TO THIS FINANCING AND HAVE NOT PROVIDED OR REVIEWED, AND ARE NOT RESPONSIBLE FOR, ANY DISCLOSURES OR OTHER INFORMATION SET FORTH HEREIN.  Also, at least fifteen (15) days prior to closing such financing, you shall submit to us a written statement certifying that you have not misrepresented or overstated your relationship with us and our affiliates or your rights to use the Marks.

TRA EX-C1
Q1/20

**9.3 Conditions.**  We may condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions; however, we will not unreasonably withhold, delay or condition our consent to a Transfer if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment.  If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our application, qualify to be a Franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new Franchise applicant, pay the Application Fee and Relicense Fee then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us.  We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities or, in the alternative, condition our approval of the Transfer on limiting the transferee's term to the balance of your Term or adding a right to terminate without cause exercisable by either party after a period of time has elapsed. Our consent to the transaction will not be effective until these conditions are satisfied.  If we do not approve the Transfer, we may, in our sole discretion, allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1.  Such payment would be due and payable when you transfer possession of the Facility.  We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to a transfer is not a waiver of (i) any claims we may have against you; or (ii) our right to demand strict compliance from the Transferee with the terms of its agreement.

**9.4 Permitted Transferee Transactions.**  Provided that you comply with this Section 9.4 you may (i) transfer an Equity Interest to a Permitted Transferee or (ii) effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee.  No Transfer will be deemed to occur.  You must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6.  Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees.  No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any guaranty of this Agreement.  A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5 Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained will be void, as between you and us.  You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6 Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction.  You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility.  We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days.  You will notify us in writing within 30 days after a change in

TRA EX-C1
Q1/20

ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner.  You will provide us with lists of the names, addresses, and owner ship percentages of your owner(s) at our request.

**10. Our Assignments.**  We may transfer, assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent.  You are not the third party beneficiary of any contract with a third party to provide services to you under this Agreement.  We may dissolve, terminate and wind up our business under applicable law but we will transfer the System and this Agreement to a party that will perform the franchisor's obligations and that will assume this Agreement in writing.  We will have no obligations to you with respect to any assigned right or duty after you are notified that our transferee has assumed such rights or duties under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1    **Default.**  You will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or under any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement.  If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you, under Section 11.2.  We will not exercise our right to terminate if you have completely cured your default during the time allowed for cure, or until any waiting period required by law has elapsed.  In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection.  If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection.  We may terminate this Agreement and any or all rights granted hereunder if you do not timely perform that improvement agreement.

11.2    **Termination.**  We may terminate the this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under  Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Travelodge" or "Thriftlodge" or "Travelodge by Wyndham" as appropriate, (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose ownership possession or the right to possession of the Facility or otherwise lose the right to conduct the franchised business at the Location, (5) you (or any guarantor) suffer the termination of another franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay

16

TRA EX-C1
Q1/20

debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests (14) if a threat to public health or safety exists at the Facility and we reasonably determine that an immediate shut down of the Facility to be necessary to avoid substantial risk of liability or goodwill, (15) you disclose any Confidential Information in violation of this Agreement.

11.3    **Casualty and Condemnation.**

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty.  This restoration will be completed within 180 days after the Casualty.  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first.  If this Agreement so terminates, you will pay all amounts accrued prior to Termination and follow the post-termination requirements in Section 13.  You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient guest lodging facility for 3 years after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date.  This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority but you will be liable for the  condemnation payments set forth in Section 12.2.

11.3.3  Any protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4    **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue reservation referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default.  All fees accrue during the suspension period.  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform.  We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Reconnection Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration.  We may deduct points under

17

our quality assurance inspection program for your failure to comply with this Agreement or System Standards.    We may also suspend or terminate any temporary or other fee reductions we may have agreed to in this Agreement and/or any stipulations in Section 18 below, and/or cease to provide any operational support until you address any failure to perform under this Agreement.  You agree that our exercise of any rights in this Section will not constitute an actual or constructive Termination of this Agreement.  All such remedies are cumulative and not in lieu of any other rights or remedies we may have under this Agreement.  If we exercise our right not to terminate this Agreement but to implement such suspension and/or removal, we reserve the right at any time after the appropriate cure period under the written notice has lapsed, to, upon written notice to you, terminate this Agreement without giving you any additional corrective or cure period (subject to applicable law). You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief, without the need for posting any bond.  We may litigate to collect amounts due under this Agreement without first issuing a default or Termination notice.  Consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults. Once a Termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may cease accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date including or following the Termination or expiration of this Agreement.

11.5    **Your Remedies.**

11.5.1  If our approval or consent is required under this Agreement and we fail to issue our approval or consent within a reasonable time, but in any event not less than 30 days after we receive all of the information we request, and you believe our failure to approve or consent is wrongful, then you may bring a legal action against us to compel us to issue our approval or consent to the obligation.  To the extent permitted by applicable law, this action shall be your exclusive remedy.

11.5.2  You (and your owners and guarantors) waive, to the fullest extent permitted by law, any right to, or claim for, any punitive or exemplary damages against us and against any affiliates, owners, employees or agents of us, and agree that in the event of a dispute, you will be limited to the recovery of any actual damages sustained and any equitable relief to which you might be entitled.

**12. <u>Liquidated Damages</u>.**

12.1    **Generally.**   If we terminate this Agreement under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 10 days following the date of Termination, as Liquidated Damages, an amount equal to the average monthly accrued Recurring Fees during the immediately preceding 12 full calendar months multiplied by 24 (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of Termination, whichever is less). If the Facility has been open for fewer than 12 months, then the amount shall be the average monthly Recurring Fees since the Opening Date multiplied by 24.  You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 10 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms that you are authorized

18

to operate under Schedule B of this Agreement as of the Termination. In the event that we authorize you to reduce the number of rooms at the Facility after the Opening Date, then we reserve the right to charge Liquidated Damages for those rooms on a per-room basis, either at the time they are removed from the Facility's inventory or at Termination. If we terminate this Agreement under Schedule D before the Opening Date, then you will pay us, within 10 days after you receive our notice of termination, Liquidated Damages in an amount equal to $1,000 per guest room described on Schedule B. If any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Agreement limits your ability to pay, and our ability to receive, the Liquidated Damages you are obligated to pay hereunder, you shall be liable to us for any and all damages which we incur, now or in the future, as a result of your breach of this Agreement. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2    **Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer.  You will pay us Liquidated Damages equal to the average daily Recurring Fees  for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one year notice period expires.  This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority).  You will pay no Liquidated Damages if the Condemnation is completed after the one year notice period expires, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

13. **Your Duties At and After Termination.**    When a Termination occurs for any reason whatsoever:

13.1    **System Usage Ceases.**  You must comply with the following "de-identification" obligations.  You will immediately stop using the System to operate and identify the Facility.  You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual or other brand directives for changing the identification of the Facility.  You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.  If you do not strictly comply with all of the de-identification requirements above, in the System Standards Manual and in our other brand directives, you agree to pay us a royalty equal to $2,000 per day until de-identification is completed to our satisfaction.

13.1.1  **Cancel Assumed Name Certificate.**  You shall take such action as may be necessary to cancel any assumed name or equivalent registration which contains the name "Wingate by Wyndham" or any variation thereof or any other Mark.  You shall provide us with evidence to our satisfaction of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

13.2    **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days

19

TRA EX-C1
Q1/20

after Termination.  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4.  We may notify third parties that the Facility is no longer associated with the Chain.  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours.  If you have not completed your de-identification obligations to our satisfaction, we may  paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after Termination.  You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage.  We will exercise reasonable care in removing or painting over signage.  We will have no obligation or liability to restore the Facility to its condition prior to removing the signage.  We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.  You will transfer to us any domain names you own that include any material portion of the Marks.

13.3    **Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to Termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions. You acknowledge and agree that once a Termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may stop accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date on or after the Termination or expiration of this Agreement.  In addition, when this Agreement terminates or expires for any reason, we have the right to contact those individuals or entities who have reserved rooms with you through the Central Reservation System to inform them that your lodging facility is no longer part of the System.  We further have the right to inform those guests of other facilities within the System that are near your Facility in the event that the guests prefer to change their reservations.  You agree that the exercise of our rights under this Section will not constitute an interference with your contractual or business relationship.

13.4    **Survival of Certain Provisions.**  Sections 3.6 (as to audits, for 2 years after Termination), the first two sentences of 3.11, 7 (as to amounts accruing through Termination), 8, 11.3.2, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement.  Additionally, all covenants, obligations and agreements of yours which by their terms or by implication are to be performed after the Termination or expiration of the Term, shall survive such termination or expiration.

**14. <u>Your Representations and Warranties</u>.**    You expressly represent and warrant to us as follows:

14.1    **Quiet Enjoyment and Financing.**    You own, or will own prior to commencing improvement, or lease, the Location and the Facility.  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.  You have, when you sign this Agreement, and will maintain during the Term,

20

TRA EX-C1
Q1/20

adequate financial liquidity and financial resources to perform your obligations under this Agreement. If you are an entity, all of your owners, including any subsequent person or entity that becomes an owner at any time after the Effective Date, shall sign our then-current form of personal guaranty guaranteeing all of your obligations under this Agreement, unless expressly waived by us in our sole discretion.

14.2    **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. You represent and warrant to us that the information you provided in your Application is true, correct and accurate. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

14.3    **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

## 15. Proprietary Rights.

15.1    **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing. You agree (i) to execute any documents we request to obtain or maintain protection for the Marks; (ii) use the Marks only in connection with the operation of the Facility as permitted by the System Standards; and (iii) that your unauthorized use of the Marks shall constitute both an infringement of our rights and a material breach of your obligations under this Agreement. You shall not, and shall not assist other to, challenge or otherwise contest the validity or ownership of the System or Marks.

21

TRA EX-C1
Q1/20

15.2    **Inurements.**    All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

15.3    **Other Locations and Systems.**    We and our affiliates each reserve the right to own, (including through a joint venture or otherwise) in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as  franchisor or franchisee), or provide services to (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, Approved Supplier lists, franchise sales personnel (or independent franchise sales representatives).

15.4    **Confidential Information.**    You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon Termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5    **Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone have the right to control any proceeding or litigation involving use of all or any part of the System, including any settlement.   We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.  We also have the right to keep all sums obtained in settlement or as a damages award in

TRA EX-C1
Q1/20

any proceeding or litigation without any obligation to share any portion of the settlement sums or damages award with you. You will cooperate with our efforts to resolve these disputes.

15.6    **The Internet and other Distribution Channels.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a Mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent.  You will assign to us any such identification at our request without compensation or consideration. You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent. You must make available through the Reservation System and the Chain Website all rates you offer directly to the general public or indirectly via Internet marketing arrangements with third parties.  You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs.  You must participate in the Chain's best available rate on the Internet guarantee or successor program.  The content you provide us or use yourself for any Internet or distribution marketing materials must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards.  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

16.1    **Independence.**  You are an independent contractor.  You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever.  We and you have a business relationship based entirely on and circumscribed by this Agreement.  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.  You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2    **Joint Status.**  If you are comprised of two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly.  The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

17.1    **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect.  If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected.

23

TRA EX-C1
Q1/20

However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2   **Waivers, Modifications and Approvals.**   If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3   **Notices.**   Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, (iii) by first class, prepaid certified or registered mail, return receipt requested, (iv) by electronic mail, posting of the notice on our Chain intranet site or by a similar technology; or (v)  by such other means as to result in actual or constructive receipt  by the person or office holder designated below, to the appropriate party at its address stated below or as it may otherwise designated by notice.  The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us.  Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Travelodge Hotels, Inc.:
Our address:  22 Sylvan Way, Parsippany, New Jersey 07054-0278
Attention: Senior Vice President – Franchise Services; Fax No.  (973) 753-7254

Your name: Covington RE LLC                ,
Your address: 2605 South Range Avenue, Denham Springs, LA 70726                ,
Attention: Bhagirath Joshi;
Your fax No.:          ; Your e-mail address: bjoshi@rocketmail.com

17.4   **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity.  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5   **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties.  There are no third party beneficiaries.  No agreement between us and anyone else is for your benefit.  The section headings in this Agreement are for convenience of reference only.

17.6   **Choice of Law; Venue; Dispute Resolution.**

17.6.1  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles.  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or

24

TRA EX-C1
Q1/20

the parties' relationship promptly through negotiation between authorized representatives.  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation.  Either party may request mediation which shall be conducted by a mutually acceptable and neutral third party organization.  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

17.6.4  **WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5  Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action.  You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

17.7     **Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

17.7.1  **You have read our disclosure document for prospective franchisees ("FDD") and independently evaluated and investigated the risks of investing in the hotel industry generally and purchasing this franchise specifically, including such factors as current and potential market conditions, owning a franchise and various competitive factors**.

17.7.2  **You have received our FDD at least 14 days before signing this Agreement or paying any fee to us.**

17.7.3  **Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

17.7.4  **This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise other than the representations set forth in the FDD.  Notwithstanding the foregoing, no provision in any franchise or membership agreement, or any related agreement, is intended to disclaim the express representations made in the FDD.**

17.7.5  **You acknowledge that no salesperson has made any promise or provided any**

25

TRA EX-C1
Q1/20

**information to you about actual or projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement and signed by us.**

17.7.6 **You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17.8   **Force Majeure.**  Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from:  (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism, or riot; (c) legal restrictions that prohibit or prevent performance; or (d) any other similar event or cause beyond the control of the party affected.  Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

17.9   **No Right to Offset**.  You acknowledge and agree that you will not withhold or offset any liquidated or unliquidated amounts, damages or other monies allegedly due you by us against any Recurring Fees or any other fees due us under this Agreement.

**18**.   **Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1.  **Combined Fees**.  Notwithstanding Section 7.1, you will pay a Combined Fee consisting of the Royalty and System Assessment Fee (which is comprised of a Marketing Contribution, Daily Guest Room Charge and Basic Reservation Fee) at the rates set forth in this Section.  The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement.

18.1.1  The Combined Fee shall be five percent (5%) of Gross Room Revenues accruing during the first Franchise Year; and

18.1.2   The Combined Fee shall be five and one-half percent (5.5%) of Gross Room Revenues accruing during the second Franchise Year; and

18.1.3  The Combined Fee shall be six percent (6%) of Gross Room Revenues accruing during the third Franchise Year; and

26

TRA EX-C1
Q1/20

18.1.4  The Combined Fee shall be seven percent (7%) of Gross Room Revenues accruing during the fourth Franchise Year; and

18.1.5  The Combined Fee shall be seven and one-half percent (7.5%) of Gross Room Revenues accruing during the fifth Franchise Year; and

18.1.6  The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the fifth Franchise Year.

18.1.7   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you either satisfy the Improvement Obligation or fail to complete it by the required deadlines, the Facility receives a quality assurance inspection score of less than 80% (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of more than 80% in a re-inspection to be performed not less than 60 days after the initial inspection.

18.2  **Your Additional Termination Right.** You may terminate this Agreement without cause or penalty effective only on the **seventh** anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination.  You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 80% (or its then equivalent) on a quality assurance inspection and then fails to achieve a score more than 80% (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.3   **Our Additional Termination Right**.  We may terminate this Agreement without cause or penalty effective only on the **seventh** anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination.  You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

**[Signatures follow on next page]**

27

TRA EX-C1
Q1/20

IN WITNESS WHEREOF, the parties have executed this Agreement on this 21 day of December, 20 20 and agree to be bound by the terms and conditions of this Agreement as of the Effective Date.

**WE:**
TRAVELODGE HOTELS, INC.

DocuSigned by:

By:_____
  *Shilpan Patel*
  69D9CAC798BF412...
  Shilpan Patel
  Senior Vice President, Franchise Services

**YOU**, as franchisee:
COVINGTON RE LLC

DocuSigned by:

By:_____
  *Bhagirath Joshi*
  6A2619E8F91D43C...
  (Managing) Member

28

TRA EX-C1
Q1/20

# APPENDIX A

## DEFINITIONS

Additional Fees means the fees charged under Section 7.1.2 other than the System Assessment Fee.

Agreement means this Franchise Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D.

Basic Reservation Fee means the fees set forth in Section 7.1.2 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Chain Websites means any current or future consumer or business websites, mobile websites or mobile applications that we or our affiliates develop for booking reservations for and/or providing information about Chain Facilities, and any future equivalent technology.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Registration Fee means the fee charged for attendance at the annual Chain conference.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence.  Confidential Information includes all other system standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the property management system software and other applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction

Appendix A - 29

materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction or series of transactions in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes in one transaction or a series of transactions. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner in one transaction or a series of transactions. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date in one transaction or a series of transactions. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority in one transaction or a series of transactions.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Franchise means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

Franchise Year means:

Appendix A - 30

TRA EX-C1
Q1/20

(i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest (sleeping) rooms at the Facility, including all credit transactions, whether or not collected, guaranteed no-show revenue, net of chargebacks from credit card issuers, any proceeds from any business interruption or similar insurance applicable to the loss of revenues due to the non-availability of guest rooms and any miscellaneous fees charged to all guests regardless of the accounting treatment of such fees. Excluded from Gross Room Revenues are separate charges to guests for Food and Beverage (including room service); actual telephone charges for calls made from a guest room; key forfeitures and entertainment (including Internet fees and commissions); vending machine receipts; and federal, state and local sales, occupancy and use taxes. Gross Room Revenues is further described in System Standards.

Guest Information means any names, email addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including without limitation stay information, that either you or we or a person acting on behalf of you, us, or both you and us, receives from or on behalf of the other or any guest or customer of the Facility or any other third party.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D.

Indemnitees means us, our direct and indirect parent, subsidiary and affiliate entities, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6, if the Agreement is for a new construction or conversion franchise.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 2311 Home Depot Drive, Denham Springs, LA 70726, as more fully described in Schedule A.

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation

Appendix A - 31

TRA EX-C1
Q1/20

investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($100.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Loyalty Program Charge means the fee you pay us under Section 3.4.4 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marketing Contribution means the fee you pay to us under Section 7.1.2 and Schedule C, as amended, for advertising, marketing, training and other services.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Travelodge" or "Thriftlodge", the "Sleepy Bear" logo and other marks (U.S. Reg. Nos. 1,474,602; 1,869,185; 1,868,724; 1,879,457; 1,868,761; 950,278; 2,438,683; 4,427,861; 4,395,251; and 5,624,177) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.14.

Opening Date has the meaning specified in Schedule D.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person

TRA EX-C1
Q1/20

or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

<u>Prototype Plans</u> has the meaning specified in Schedule D for New Construction Facilities.

<u>Punch List</u> means the list of upgrades, updates, improvements, repairs, repainting, refurbishing and replacements we prepare that are required to be completed pursuant to this Agreement.

<u>Reconnection Fee</u> means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement or for any other reason, in the amount specified in Schedule C.

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

<u>Reinspection Fee</u> means the fee you must pay to us under Section 3.7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

<u>Relicense Fee</u> means the fee your transferee pays to us when a Transfer occurs, or the fee you pay to us if you are renewing an existing franchise.

<u>Reservation System</u> or "Central Reservation System" means the back end technology platform and applications used by us to accept, store and/or communicate reservations for Chain Facilities.  The Reservation System is separate from, but enables, the booking of reservations for Chain Facilities through various distribution channels such as the Chain Websites, the GDS and other distribution channels.

<u>Rooms Addition Fee</u> means the fee we charge you for adding guest rooms to the Facility.

<u>Royalty</u> means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

<u>System</u> means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

<u>System Assessment Fees</u> means the assessments charged as set forth in Section 7.1.2 and Schedule C.

<u>System Standards</u> means the standards for participating in the System published in the System Standards Manual or elsewhere, including but not limited to design standards, FF&E standards, Marks standards, marketing standards, operations standards, technology standards and maintenance standards and any other standards, policies, rules and procedures we promulgate about System

Appendix A - 33

TRA EX-C1
Q1/20

operation and usage.

System Standards Manual means the Standards of Operation and Design Manual and any other manual or written directive or communication we issue or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility.  A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Travelodge Hotels, Inc., a Delaware corporation, its successors and assigns.

TRA EX-C1
Q1/20

# SCHEDULE A

(Legal Description of Facility)

Schedule A - 35

## **SCHEDULE B**

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|---------------------|------------------------|---------------------|
| Bhagirath Joshi | 95% | | |
| Alaknanda Joshi | 5% | | |

PART II:        THE FACILITY:

Primary designation of Facility: **Inn**

Number of approved guest rooms: **46**



Initial

Schedule B - 36

**TRAVELODGE HOTELS, INC.**
**SCHEDULE C**
**April 2020**

### I.     System Assessment Fee

The System Assessment Fee includes the Marketing Contribution, the Daily Guest Room Charge and the Basic Reservation Fee.  The Marketing Contribution is equal to two percent (2%) of Gross Room Revenues.  The Daily Guest Room Charge is ten cents ($.10) per available guest room per day for the first 100 rooms and five cents ($.05) per available guest room per day for each additional room of the Facility.  The Basic Reservation Fee is 2% of Gross Room Revenues.  We reserve the right, in our sole discretion, to increase or modify the System Assessment Fees for all Chain Facilities from time to time to cover costs (including reasonable direct or indirect overhead costs) related to the services and programs referenced in Section 7.1.2 after consultation with the TFAC board

### II.     Additional Fees

### A.     Loyalty Program Fees

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program.  The Loyalty Program Charge is 5% of any amounts on which members of the Loyalty Program earn points or other program currency at the Facility as defined in the Front Desk Guide or any other program rules, which are System Standards.  We will proactively match and award members with points or other program currency they earn at the Facility even if they do not present their Wyndham Rewards membership number upon check–in. You will be billed monthly in arrears for points or other program currency awarded to members during the preceding month. If you do not achieve a certain number of Wyndham Rewards valid enrollments, you must pay us a Retraining Fee of up to $400 per month as described in the Front Desk Guide.  If you do not process a member's points in a timely manner and we must resolve the issue with the member, we will charge you a Loyalty Member Services Administration Fee as described in the Front Desk Guide.

### B.     Customer Care Fee

We will contact you if we receive any guest complaint about you or the Facility and you will be responsible for resolving the complaint to the satisfaction of the guest.  We may also contact you, at our discretion, if we become aware of any other complaints about the Facility including complaints which are posted on third-party travel websites, distribution channels, blogs and social networks, or other forums to which you do not respond.  If you do not respond to and resolve any complaint to the guest's satisfaction within three business days after we refer it to you, we will charge you a "Customer Care Fee" of $195.00, plus the costs we incur to settle the matter with the guest.  The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

Schedule C - 37

TRA EX-C1
Q120

C.      **Best Rate Guarantee Program**

You must (i) make available to us through the Central Reservation System and the Chain Websites room rates for the Facility equivalent to those you offer to the general public directly or indirectly via third parties that you authorize to offer and sell reservations for the Facility's guest rooms, and (ii) participate in the Chain's Best Rate Guarantee Program according to its published requirements. If we, or a guest, identifies a publicly available rate for the Facility that is lower than the rate that you have provided to us for the same date, then we may charge you a Processing Fee, currently $195, to reimburse us for our administrative charges to process each discrepancy.

D.      **Reconnection Fee**

If we suspend Central Reservation System service because of your default under this Agreement or for any other reason, then you must pay us the Reconnection Fee set forth in the System Standards before we restore service.  Currently, the Reconnection Fee is $4,000.

E.      **Other Fees, Commissions and Charges**

You will pay us a fee, as applicable, for reservations for your Facility from certain distribution partners processed through various reservation channels.  "GDS Fees" are assessed for qualified reservations processed through any global distribution system ("GDS") or through any Internet website or other booking source powered by a GDS.  "Internet Booking Fees" are assessed for qualified reservations processed through an Internet website connected through an alternate distribution system.  "Third Party Channel Fees" are assessed for qualified reservations coming from our partners directly or indirectly to our distribution platform. We will establish the amount of the GDS, Internet Booking Fees, and Third Party Channel Fees from time to time based on the fees these channels charge us and/or our own costs (including overhead) for providing these services.  Some of our distribution partners may charge a commission on reservations you receive through these reservation channels and, if we pay such commission on your behalf, you will reimburse us and pay our service charge of 1.5% of commissionable revenue.  Upon written notice to you, we may alter, change, modify, remove or add new fees as existing reservation channels are modified or partners are added to existing channels or new reservation channels are established.

You will also pay commissions for (a) reservations booked by "Agents" and/or (b) qualified reservations consumed by members of affinity groups and organizations that participate in our Member Benefits program.  You must pay our service charge of 1.5% of commissionable revenue, if applicable.  "Agents" include, but are not limited to, travel agents, on-line travel and referral websites, travel consortia, travel management companies, and global sales agents, as well as digital media linking to Chain websites and unique call center numbers purchased by the pay-for-performance program ("PFP").  These commission payments may go to the Agent, affinity group or organization in whole or a portion of the payment may be allocated to various marketing activities and/or to our Global Sales Organization to offset its administrative and overhead costs for supporting the Member Benefit Program and other programs that generate room nights at Chain Facilities, or, in the case of the PFP program, to fund purchases of

Schedule C - 38

TRA EX-C1
Q120

additional digital media directing consumers to Chain websites and unique call center numbers.

Under our Wyndham Referral Rewards Program, Chain Facilities may receive leads from other Chain Facilities, facilities of our affiliates and employees of our parent company or its predecessor.  For this business, we charge you a referral commission of 10% of commissionable revenue on qualifying reservations. When the referring party is a Chain Facility or facility of an affiliate 7% of the referral commission is paid to the referring facility; and when the referring party is an employee of our parent company or its predecessor, 6% of the referral commission is paid to the employee.  The remaining 3% and 4%, as applicable, is distributed to our Global Sales Organization to offset its administrative and overhead costs for supporting the Wyndham Referral Rewards Program.

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services, programs and distribution channels at any time upon not less than thirty (30) days' written notice.

TRA EX-C1
Q120

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

This Addendum applies if you are converting an existing guest lodging facility to a Chain Facility.

## 1. YOUR IMPROVEMENT OBLIGATION.

**1.1 Generally.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with this Agreement and System Standards. You must provide us with proof that you own or lease the Facility by the earlier to occur of (a) 30 days after the Effective Date or (b) the Opening Date. You must maintain control of the Facility consistent with such documentation during the Term. You must begin renovation of the Facility no later than 30 days after the Effective Date. <u>Time is of the essence for the completion of the Improvement Obligation</u>. We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation. The grant of an extension will not waive any other default existing at the time the extension is granted. All renovations must comply with System Standards, any Approved Plans, this Agreement and the Punch List. Your general contractor or you must carry the insurance required under this Agreement during renovation.

**1.2 Pre-Opening Improvements.** You must complete all renovations specified as "prior to opening" on the Punch List before we consider the Facility to be ready to open under the System. The deadline for completing the pre-opening phase of conversion and the renovations shall be as specified on any Punch List attached to this Agreement, but is otherwise 90 days from the Effective Date. You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening improvements of the Facility by the dates specified on the Punch List or otherwise and you fail to do so within five days after we send you written notice of default, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System in violation of this Schedule and you fail to cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default. If we choose to grant an extension of any deadline, including the Facility's Opening Date, you will pay us a non-refundable extension fee of $5,000. This fee will be payable to us within ten (10) days of the Opening Date. You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete the Improvement Obligation by the deadline established in the Punch List or otherwise and our representatives must return to the Facility to inspect it. In limited circumstances, you may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our prior written approval. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Section 11, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

Schedule D Conversion - 40

**1.3 Improvement Plans.**

(a) Generally.  You will create plans and specifications for the work described in Section 1.1 of this Schedule D (based upon System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like, who must exercise their own independent professional care, skill and diligence in the design and renovation of your Facility.  Our review does not cover technical, architectural or engineering factors relating to the existing structure at the Location, the validity of conversion given the existing structure, or compliance with federal, state or local laws, regulations or code requirements, for which your architect is responsible.  You must allow for 10 days of our review each time you submit plans to us.  We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after the renovation.  Any material variation from the Approved Plans requires our prior written approval.  Approved Plans must incorporate design elements as set forth in System Standards.  You may purchase furniture, fixtures, equipment and other supplies that you may need during renovation of the Facility through our affiliate, Worldwide Sourcing Solutions, Inc.'s "Approved Supplier" program.  If you choose to purchase certain design items from a supplier other than an Approved Supplier, we may charge you a Custom Interior Design Review Fee, currently $6,,000 .  This fee will be assessed for our review of custom interior design drawings which you must submit to us to ensure compliance with our interior design standards.    We may offer other optional architectural and design services for a separate fee.  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request.

(b)  Deviation from Approved Plans. We may inspect the work while in progress without prior notice.  We may direct you to change the work in progress if it deviates from the Approved Plans or System Standards and may terminate this Agreement if you fail to comply with any such direction.  If you encounter unexpected issues with demolition, renovation, reconstruction or refurbishment of the existing structure which make continuation of the project using the Approved Plans commercially infeasible, you must notify us immediately and provide a complete written report on the matter, including any proposal to modify the Approved Plans you believe is appropriate together with your estimate of the projected costs of meeting the Approved Plans.  We will evaluate the report, your proposal and the situation and respond within 30 days to any request to vary the Approved Plans, or provide suggestions for resolving the issues in such a manner as will be acceptable to us.  Neither party shall terminate this Agreement unless and until such notice is given and the 30 day period shall have elapsed without agreement on modifying the Approved Plans.  If either party then decides to terminate this Agreement, you will pay, if then not paid, and we will retain, the full Initial Fee.  Provided that we determine in our reasonable discretion that continuation of the project using the Approved Plans or any modification of the Approved Plans is not commercially feasible then as Liquidated Damages shall not be owed.

Schedule D Conversion - 41

TRA EX-C1
Q1/20

## 2. ONBOARDING AND MANDATORY SUPPORT SERVICES AND FEES

**2.1 Onboarding Services.**   We will provide training through various on-line courses on subjects such as quality assurance, housekeeping, preventative maintenance, customer service, and the request for proposal process.  A member of our field team will also assist with property operations topics including Systems Standards and use of the Chain's intranet site.   These onboarding services are provided as part of the Initial Fee required in Section 6.

2.2 **Mandatory Support Services and Fees.**  We will arrange for delivery of an initial supply of key property supplies that assist the Facility with meeting System Standards and/or participating in key marketing initiatives as reasonably determined by us.  You will pay $500 for your initial supplies.  We will arrange to have our preferred photography provider take digital photographs of the in accordance with System Standards for use on our Chain Websites, third party travel websites and various marketing media and such photographs will be owned by us.  You will pay $2,450 for the required photo package. If we allow you to open the Facility before your installation of permanent signage, we will arrange for one of our Approved Suppliers to provide temporary exterior signage for the Facility in the form of a Mark-bearing bag to cover your existing primary free standing sign.  You will pay $1,000 for this temporary signage.  If you install permanent signage from an Approved Supplier for the Facility on or before the Opening Date, or if within thirty (30) days of the Opening Date you sign a quote and pay the required deposit for permanent signage from the vendor assigned to provide temporary signage for the Facility, then we shall issue you a credit of $1,000. We will provide training for your general manager as set forth in Section 4.1 of the Agreement if he/she attends the training by the deadline set forth in Section 4.1.   The tuition for this mandatory training program is currently $2,250.

## 3. DEFINITIONS.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

TRA EX-C1
Q1/20

# SCHEDULE D
# ADDENDUM FOR CONVERSION FACILITIES


**[Punch List Attached]**

TRA EX-C1
Q1/20

# GUARANTY

To induce TRAVELODGE HOTELS, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments,  will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee.  We waive notice of amendment of the Agreement.  We acknowledge that Section 17 of the Agreement, including Remedies, Venue, and Dispute Resolution and WAIVER OF JURY TRIAL applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

DocuSigned by:

*Bhagirath Joshi*

6A2619E8F91D43C

Name:  Bhagirath Joshi
Address: 23911 Terrace Ave.
Denham Springs, LA 70726

TRA EX-C1
Q1/20

# EXHIBIT B

Facility:     Denham Springs, LA

File No.:     55072-16502-02

Brand:     Travelodge

### SynXis Subscription Agreement

This SynXis Subscription Agreement ("**Agreement**"), effective as of <u>December 21</u>, 20 <u>20</u> (the "**Effective Date**"), by and between **TRAVELODGE HOTELS, INC.,**, a Delaware corporation ("**Franchisor**"), and COVINGTON RE LLC    , a Louisiana limited liability company ("**Franchisee**"), governs Franchisee's access to and use of the SaaS Solution and Services as described herein. Franchisor and Franchisee shall each be referred to herein as a "**Party**" and together as the "**Parties**" to this Agreement.

For and in consideration of the mutual covenants, representations and promises hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree to the foregoing and as follows:

1.    **GENERAL**

     **1.1   Definitions.**  Capitalized terms used herein shall have the meanings ascribed to them in this Agreement or in any Schedules attached hereto, which may be updated or supplemented by Franchisor from time to time, or as defined in <u>Schedule 1.1</u>.  All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise Agreement and are incorporated herein by reference.

     **1.2   Conflicts in Interpretation.**  The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Schedules attached hereto: (a) first, the terms contained in the body of this Agreement; and (b) second, the terms of the Schedules attached to this Agreement, provided that no order of precedence shall be applied among such Schedules.

2.    **DESCRIPTION OF SAAS SOLUTION**

     **2.1   The SaaS Solution.**  The "**SaaS Solution**" means the computer program, applications, features and services expressly identified on <u>Schedule 2.1</u> and any and all modifications, corrections, updates and enhancements to such SaaS Solution, including any Franchisor may from time to time make available to Franchisee.  The SaaS Solution does not include any Non-SaaS Solution Services as specified in Section 7.

     **2.2   Elavon Hosting Services Agreement.**  In order to access and use the SaaS Solution pursuant to this Agreement, on or before ten (10) days following the Effective Date, Franchisee shall execute that certain Hosted Services Agreement for Hosted Gateway Services directly with Elavon Inc., or a substantially similar agreement with an alternate vendor designated by Franchisor, ("**Elavon Agreement**").  The Elavon Agreement exclusively covers the offering provided thereunder (the "**Elavon Non-SaaS Solution Services**").

     **2.3   Implementation Services.**  On a date after which Franchisee has signed both the Elavon Agreement and this Agreement, Franchisor shall use reasonable efforts to implement the SaaS Solution as described in <u>Schedule 2.3</u> attached hereto (the "**Implementation Services**") and Franchisee shall follow all of Franchisor's instructions for preparing the Facility, at Franchisee's sole expense, for implementation of the SaaS Solution.  The SaaS Solution shall

1

be deemed accepted by Franchisee ("**Acceptance**") immediately upon implementation of the SaaS Solution by Franchisor (the "**Acceptance Date**").

3. **<u>GRANT OF RIGHTS</u>**

**3.1  License.**  Subject to payment of all applicable fees, Franchisor hereby grants to Franchisee a limited, non-transferable, non-exclusive license, to access, use and display the SaaS Solution during the Term solely for the Permitted Use and solely by End Users in accordance with the terms and conditions set forth in this Agreement.

**3.2  Limitations.**  Except as provided in Section 3.1, all rights, title and interests in and to the SaaS Solution are reserved to Franchisor or to any Third Party who licenses the SaaS Solution to Franchisor or to Franchisor's Affiliates.

**3.3  Title.**  Title to and ownership of the SaaS Solution, including all Intellectual Property rights therein, is and shall remain with Franchisor, its Affiliates or any Third Party who licenses it to Franchisor.  Franchisee shall at all times protect and defend, at Franchisee's own cost and expense, Franchisor's rights, title and interests in and to the SaaS Solution against all claims, liens and legal processes of Franchisee's creditors.

**3.4  Restrictions.**  Franchisee shall not: (a) permit any unauthorized Third Party to access or use the SaaS Solution; (b) create or attempt to create any derivate works based on the SaaS Solution; (c) copy, frame or mirror any part or content of the SaaS Solution; (d) disassemble, decompile, reverse engineer or otherwise attempt to recreate the SaaS Solution; or (e) access, use or otherwise manipulate the SaaS Solution in order to create a competitive product or service or to copy any features, functions or graphics of the SaaS Solution. Franchisor may, at its sole discretion and without prior notice to Franchisee, conduct audits of Franchisee's Hardware, computer systems and applications, including audits by electronic and remote means, to verify conformance with this Agreement.

**3.5  Suggestions.**  Any suggestions and feedback relating to the SaaS Solution or Services or relating to any desired or recommended additional features, enhancements or modifications to the SaaS Solution or Services that are provided by or through Franchisee or its Affiliates to Franchisor shall be the exclusive property of Franchisor as of the date it is offered to Franchisor and Franchisee and its Affiliates hereby assign all rights and interests in and to such suggestions and feedback to Franchisor as of the date it is offered to Franchisor.

4. **<u>SERVICES</u>**

**4.1  Additional Services.**  Franchisor may perform additional services agreed to in writing by the parties from time to time, which may include additional fees to be agreed to by the Parties (the "**Additional Services**").

**4.2  Rate Audit Services.**  From time to time, Franchisor may provide services to Franchisee under Franchisor's Central Rate and Inventory Support Program (the "**CRISP Services**") consistent with <u>Schedule 4.2</u> attached hereto, which may be updated or supplemented by Franchisor from time to time.

SynXis
Q1/20

**4.3   Maintenance and Support Services.**  Subject to Franchisee performing all Franchisee Responsibilities identified in <u>Schedule 4.3</u> ("**Franchisee Responsibilities**"), Franchisor shall provide maintenance and support services as set forth on <u>Schedule 4.3</u> attached hereto ("**Maintenance and Support Services**").

**4.4   Access Credentials.**  Franchisor, directly or indirectly, shall provide Access Credentials to Franchisee.  Franchisor may, from time to time and in its sole discretion, change or require Franchisee to change Franchisee's Access Credentials. Franchisee must follow all security procedures and protocols that Franchisor may from time to time establish or modify. Franchisee shall not permit the SaaS Solution to be accessed in violation of the security procedures and protocols as set forth herein. Franchisee shall safeguard any Access Credentials that Franchisor provides to Franchisee as a trade secret, and shall reveal such information only to its End Users on a need to know basis. Franchisee shall immediately inform Franchisor if Franchisee has knowledge or a reasonable basis to believe that its Access Credentials have been lost, stolen, misappropriated or compromised in any way or manner, and Franchisee shall strictly follow Franchisor's instructions regarding any replacement Access Credentials. Franchisee shall be responsible for all access or use through its Access Credentials.

**4.5   Permitted Uses**.  Franchisee shall use the SaaS Solution only for the Permitted Uses with respect to the business and operations of Franchisee as contemplated in the Franchise Agreement. Franchisee shall not load, store or otherwise use any software on or with the SaaS Solution, without Franchisor's prior written consent, as the use of such software may adversely affect the operation and functionality of the SaaS Solution and the Services. If Franchisee violates this Section, the warranties set forth in this Agreement shall be void, and Franchisee shall be solely responsible for the cost of repair or replacement of the SaaS Solution, if any.

**4.6   Franchisor's Responsibilities.**  Franchisor shall: (a) use commercially reasonable efforts to make the SaaS Solution available twenty-four (24) hours a day, seven (7) days a week, except for: (i) planned downtime, or (ii) any unavailability caused by circumstances beyond Franchisor's reasonable control, including without limitation, acts of nature, acts of government, floods, fires, earthquakes, civil unrest, acts of terror, labor strikes, Internet service provider failures or delays, or denial of service attacks; and (b) provide the SaaS Solution only in accordance with applicable laws and government regulations that govern the implementation of the SaaS Solution.

**4.7   Franchisee's Responsibilities.**  Franchisee shall: (a) be fully responsible for its End Users' compliance with this Agreement; (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent collected by Franchisee or its employees, agents or representatives, and for the means by which Franchisee or its employees, agents or representatives acquires Guest Information; (c) prevent unauthorized access to or use of the SaaS Solution, and notify Franchisor promptly of any such unauthorized access or use; and (d) use the SaaS Solution only in accordance with this Agreement and applicable laws and government regulations. Franchisee shall not: (i) make the SaaS Solution available to anyone other than authorized End Users; (ii) sell, resell, rent or lease the SaaS Solution; (iii) use the SaaS Solution to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party; (iv) use the SaaS Solution to store or transmit software viruses, malicious code or other harmful files; (v) interfere with or disrupt the integrity or performance of the SaaS Solution or the data of any Third Party contained therein; or (vi) attempt to gain unauthorized access to the SaaS Solution or any related networks.

3

SynXis
Q1/20

## 5.    FEES AND PAYMENTS

**5.1    Fees.**  Franchisee shall pay all fee amounts specified in Schedule 5.1 to this Agreement for the SaaS Solution and the Services ("**Fees**"), beginning on the Acceptance Date through the duration of the Term.  If Franchisee's franchise involves the transfer of an existing Chain Facility to Franchisee or changing affiliation of the Facility from one Wyndham Hotel Group-owned franchise system to another, Franchisee will be charged a transfer fee ("**Transfer Fee**"). Franchisee may also request additional training services, which Franchisor may provide to Franchisee for an additional fee. Franchisor may charge an additional fee for services under Section 5.4, if acceleration is at Franchisee's request.

**5.2    Payments.**  Franchisor may apply any amounts received to any outstanding invoices in any order. If Franchisee does not make all payments of Fees to Franchisor when due, then, upon written notice to Franchisee, Franchisor may withhold implementation, suspend the SaaS Solution (subject to Section 5.4 below) or terminate this Agreement. All amounts due hereunder are due upon receipt of the invoice. Franchisor may increase the ongoing Fees on an annual basis by no more than five percent (5%) above the fees paid by Franchisee during the immediately preceding twelve (12) month period; provided, however, that Franchisor shall notify Franchisee no less than thirty (30) days prior to any such increase taking effect.

**5.3    Overdue Charges.**  If any charges are not received from Franchisee by the due date, then, at Franchisor's sole discretion, (a) such charges may accrue late interest at the rate of 1.5% of the outstanding balance per month, or the maximum rate permitted by law, whichever is lower, from the date such payment was due until the date paid, and/or (b) Franchisor may condition future subscription renewals on payment terms shorter than those specified in Section 5.1 above (Fees).

**5.4    Suspension of Service and Acceleration.**  If any Fees owing by Franchisee under this Agreement for the SaaS Solution and Services is thirty (30) or more days overdue, Franchisor may, without limiting any other rights and remedies it may have, accelerate Franchisee's unpaid fee obligations under this Agreement so that all such obligations become immediately due and payable, and suspend the SaaS Solution and Services to Franchisee until such amounts are paid in full. Franchisor shall give Franchisee at least seven (7) days' prior written notice that Franchisee's account is overdue, in accordance with Section 17.1 (Notices), before suspending the SaaS Solution and Services to Franchisee.

**5.5    Taxes.**  Unless otherwise stated, Franchisor's Fees do not include any taxes, levies, duties or similar governmental assessments of any nature, including but not limited to value-added, sales, use or withholding taxes, assessable by any local, state, provincial, federal or foreign jurisdiction (collectively, "**Taxes**"). Franchisee is responsible for paying all Taxes associated with its purchases hereunder. If Franchisor has the legal obligation to pay or collect Taxes for which Franchisee is responsible under this section, the appropriate amount shall be invoiced to and paid by Franchisee, unless Franchisee provides Franchisor with a valid tax exemption certificate authorized by the appropriate taxing authority. For clarity, Franchisor is solely responsible for taxes assessable based on Franchisor's income, property and employees.

SynXis
Q1/20

**6. TECHNICAL SPECIFICATION REQUIREMENTS**

**6.1 Minimum Technical Requirements.** To access and use the SaaS Solution, Franchisee must use Hardware and subscribe to Communication Services that meet Franchisor's technical specification requirements set forth on Schedule 6.1. If any service provider(s) (including without limitation, any service provider made available by Franchisor), at Franchisee's request, attempts to integrate Hardware with the SaaS Solution or Services, Franchisor shall not be liable for any injury or damage to either the Hardware or the SaaS Solution unless such injury or damage is due to Franchisor's gross negligence or willful misconduct. For the avoidance of doubt, the warranties and support described in this Agreement do not apply to any Hardware or Communication Services.

**7. NON-SAAS SOLUTION SERVICES PROVIDERS**

**7.1 Acquisition of Non-SaaS Solution Services.** Franchisor or a Third Party may from time to time make available to Franchisee offerings designed to interoperate with the SaaS Solution ("**Non-SaaS Solution Services**"). Any acquisition by Franchisee of such Non-SaaS Solution Services, and any exchange of data between Franchisee and any Non-SaaS Solution Services provider, is solely between Franchisee and the Third Party that provides the applicable Non-SaaS Solution Services.

**7.2 No Representation or Warranty.** Franchisor does not warrant or support any Non-SaaS Solution Services. Any Non-SaaS Solution Services shall be governed exclusively by any agreement entered into between Franchisee and the Third Party that offers the applicable Non-SaaS Solution Services. If the provider of any Non-SaaS Solution Services ceases to make such Non-SaaS Solution Services available for interoperation with the SaaS Solution on reasonable terms, Franchisor may, in its sole discretion, cease providing access to such Non-SaaS Solution Services without entitling Franchisee to any refund, credit, or other compensation.

**8. CONFIDENTIALITY**

**8.1 Definition of Confidential Information.** As used herein, "**Confidential Information**" means all confidential information disclosed by a Party ("**Disclosing Party**") to the other Party ("**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure. Franchisor's Confidential Information shall include the SaaS Solution and Services. Confidential Information of each Party shall include the terms and conditions of this Agreement, as well as business and marketing plans, technology and technical information, product plans and designs, and business processes disclosed by such Party. However, Confidential Information shall not include any information that: (a) is or becomes generally known to the public without breach of any obligation owed to the Disclosing Party; (b) was known to the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (c) is received from a Third Party without breach of any obligation owed to the Disclosing Party; or (d) was independently developed by the Receiving Party.

**8.2 Protection of Confidential Information.** The Receiving Party shall: (a) use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but in no event less than reasonable care); (b) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement; and (c) except as

5

SynXis
Q1/20

otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its Affiliates' employees, contractors and agents who need such access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections no less stringent than those herein. Neither Party shall disclose the terms of this Agreement to any Third Party other than its Affiliates and their legal counsel and accountants without the other Party's prior written consent.

**8.3   Compelled Disclosure.**  The Receiving Party may disclose Confidential Information of the Disclosing Party if it is compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of such compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure. If the Receiving Party is compelled by law to disclose the Disclosing Party's Confidential Information as part of a civil proceeding to which the Disclosing Party is a party, and the Disclosing Party is not contesting the disclosure, the Disclosing Party will reimburse the Receiving Party for its reasonable cost of compiling and providing secure access to such Confidential Information.

## 9.   DATA PRIVACY

**9.1   Data Policies.**  Franchisee shall comply with and abide by Franchisor's data policies and procedures which Franchisor may, at its sole discretion and without prior notice, update from time to time (the "**Data Policies**"). If there is a conflict between the Data Policies and applicable law, Franchisee should comply with applicable law and immediately notify Franchisor in writing of such conflict.

**9.2   Guest Information.**  Franchisor and/or its Affiliate shall own all Guest Information that is within the possession of Franchisor and/or Franchisor's Affiliate or any service provider holding such information on Franchisor's or a Franchisor Affiliate's behalf, and Franchisee shall own all Guest Information that is within the possession of Franchisee or any Franchisee service provider holding such information on Franchisee's behalf. To the extent that Franchisor (including its Affiliates) and Franchisee both possess identical Guest Information, Franchisor's (including its Affiliates') and Franchisee's respective ownership rights with regard to such Guest Information shall be separate and independent from one another. Franchisee acknowledges and agrees that: (a) Franchisee shall take all commercially reasonable steps to assure the timely and accurate collection, recording, processing and transmittal of the Guest Information to the SaaS Solution at all times; and (b) with respect to Franchisee's use of the Guest Information, Franchisee shall comply with all applicable laws, Franchisor's Data Policies and any contract or promise Franchisee makes with or to any of its guests.

**9.3   Non-Owned Information.**  Other than the Guest Information, Franchisee shall not use any information it obtains from the SaaS Solution, including but not limited to any information that Franchisor appends to the Guest Information ("**Non-Owned Information**"), for the benefit of any business, enterprise or activity other than the business of the Facility, and in accordance with all applicable laws and Franchisor's Data Policies. Franchisee shall not disclose, copy, assign, transfer, lease, rent, sell, donate, disseminate or otherwise commercialize any Non-Owned Information for any other purpose without Franchisor's prior written consent, which Franchisor may withhold at its sole discretion.

**9.4   Dummy Information.**  Any information provided to Franchisee from the SaaS Solution may contain "dummy" information, special codes or other devices to assure compliance with

6

this Agreement and monitor possible unauthorized use of SaaS Solution. Franchisee shall be conclusively presumed to have violated this Agreement if Franchisor discovers any unauthorized mail or contacts from information provided only to Franchisee or the Facility.

**9.5   Improper Access.**  If Franchisee should obtain access to Non-Owned Information in violation of the Data Policies or this Agreement, Franchisee shall be a trustee of that information and must act in a fiduciary capacity to protect the information from further unauthorized use or disclosure, and take all commercially reasonable efforts to return the information to Franchisor as soon as possible.

## 10.   WARRANTY AND SUPPORT

**10.1 General.**  Franchisor warrants that following the Acceptance Date and for a period of sixty (60) days thereafter, the SaaS Solution will perform the functions and operations in a good workmanlike manner provided that Franchisee: (a) follows Franchisor's instructions, updates and modifications; (b) makes corrections, as directed; (c) pays all applicable Fees when due; and (d) is not otherwise in default under this Agreement or the Franchise Agreement. Franchisor's sole obligation under this warranty shall be to use reasonable efforts to remedy any nonperformance of the SaaS Solution within a reasonable time after Franchisee reports such nonperformance to Franchisor.

**10.2 Intellectual Property.**  Franchisor has the right to provide Franchisee with the rights granted hereunder, and, to the best of Franchisor's knowledge, the SaaS Solution does not infringe any Intellectual Property rights of any Third Party.

**10.3 Support.**  Franchisor or its Affiliates will provide a toll-free telephone number for reporting any nonperformance of the SaaS Solution, and Franchisor or its Affiliates will use reasonable efforts to diagnose and remedy such nonperformance within a reasonable time after Franchisee reports such nonperformance to Franchisor. Franchisee must perform all user-required maintenance specified by the vendor of any Hardware or Communication Services, and obtain required maintenance only from an authorized service provider.

**10.4 DISCLAIMER.**  THE WARRANTIES AND REMEDIES DESCRIBED IN THIS SECTION ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES AND REMEDIES FOR THIS SERVICE.  THE ABOVE WARRANTIES SHALL BE RENDERED NULL AND VOID IF THE SAAS SOLUTION IS SUBJECTED TO ABUSE, MISUSE, IMPROPER INSTALLATION AT THE FACILITY OR MAINTENANCE BY UNAUTHORIZED SERVICE PERSONNEL, OR IF THE SAAS SOLUTION IS ALTERED WITHOUT FRANCHISOR'S EXPRESS CONSENT OR DIRECTION, OR USED FOR A PURPOSE NOT AUTHORIZED UNDER THIS AGREEMENT, OR IF THE SAAS SOLUTION IS DAMAGED OR DESTROYED DUE TO ACTS OF NATURE, WAR, TERRORISM, CIVIL UNREST, FIRES, NATURAL DISASTERS, OR OTHER EVENTS BEYOND FRANCHISOR'S CONTROL. EXCEPT AS PROVIDED IN THIS SECTION 10, FRANCHISOR MAKES NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY WARRANTY ABOUT THE SAAS SOLUTION OR ANY SERVICES, THEIR MERCHANTABILITY OR THEIR FITNESS FOR ANY PARTICULAR PURPOSE. FRANCHISOR MAKES NO REPRESENTATION OR WARRANTY WHATSOEVER REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT THE FACILITY MAY ATTAIN THROUGH THE USE OF THE SAAS SOLUTION OR IN CONNECTION WITH THE RECEIPT OF ANY SERVICES OR THAT FRANCHISEE'S

SynXis
Q1/20

RESERVATIONS OR REVENUE WILL INCREASE. FRANCHISEE, ON BEHALF OF ITSELF, ITS SUCCESSORS AND ASSIGNS, HEREBY WAIVES, RELEASES AND RENOUNCES ANY AND ALL CLAIMS OR CAUSES OF ACTION IT MAY HAVE AGAINST FRANCHISOR, FRANCHISOR'S AFFILIATES, OR FRANCHISOR'S OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE SAAS SOLUTION, UNLESS DUE TO FRANCHISOR'S WILLFUL MISCONDUCT.

## 11.   INDEMNIFICATION

**11.1 Indemnification.**  Franchisee shall indemnify, defend and hold harmless Franchisor, Franchisor's Affiliates, its licensors and their successors and assigns and each of the respective directors, officers and employees associated with them against all claims, actions or proceedings, arising out of or related to Franchisee's operation, use or non-use of the SaaS Solution, including any use of the Guest Information or any Third Party data or system security breaches and any Non-SaaS Solution Services or agreements therefor. Franchisor shall not be liable to Franchisee or any Third Party for personal injury or property loss, including but not limited to, damage to the Facility, as a result of Franchisee's operation, use or non-use of the SaaS Solution, Franchisee's receipt of Services hereunder, and/or any Third Party data or system security breaches or any Non-SaaS Solution Services or agreements therefor. Franchisee is not obligated to indemnify Franchisor for Franchisor's own gross negligence or intentional misconduct arising out of the operation, use or non-use of the SaaS Solution.

## 12.   NO LIABILITY FOR INFORMATION

**12.1 No Liability.**  FRANCHISOR SHALL NOT BE LIABLE FOR ANY CLAIMS OR DAMAGES RESULTING FROM ANY INCORRECT INFORMATION GIVEN TO FRANCHISOR OR INPUT INTO THE SAAS SOLUTION BY ANY PERSON THAT IS NOT FRANCHISOR. SUPPORT OR SERVICES HEREUNDER NECESSITATED BY COMPUTER VIRUSES, OR BY ANY FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, INCLUDING, WITHOUT LIMITATION, DAMAGE CAUSED BY PERSONS LACKING AUTHORIZED ACCESS, ARE NOT COVERED UNDER THIS AGREEMENT. FRANCHISEE WAIVES ANY CLAIMS HEREUNDER AGAINST FRANCHISOR TO THE EXTENT ARISING FROM FRANCHISEE'S FAILURE TO HAVE OR MAINTAIN CURRENT VIRUS PROTECTION, OR TO THE EXTENT ARISING FROM A FAILURE OR BREACH OF FRANCHISEE'S SECURITY FOR ITS SYSTEMS OR DATA, OR AS A RESULT OF ANY UNAUTHORIZED ACCESS TO FRANCHISEE'S SYSTEMS.

## 13.   DAMAGE LIMITATION

**13.1** NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, NEITHER FRANCHISOR NOR FRANCHISOR'S AFFILIATES SHALL BE LIABLE TO FRANCHISEE FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS "**INDIRECT DAMAGES**") IN CONNECTION WITH THE SAAS SOLUTION OR THIS AGREEMENT, EVEN IF FRANCHISOR HAD BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE REASONABLY FORESEEN SUCH DAMAGES. IN ADDITION, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, FOR DIRECT DAMAGES CAUSED BY FRANCHISOR (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT THE ABOVE LIMITATION IS NOT RECOGNIZED BY A COURT

8

OR OTHER AUTHORITY) ANY CLAIM SHALL BE LIMITED TO THE TOTAL AMOUNT PREVIOUSLY PAID BY FRANCHISEE TO FRANCHISOR FOR THE PREVIOUS TWELVE (12) MONTH PERIOD. THE ABOVE LIMITATIONS ON LIABILITY APPLY REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, OR OTHERWISE.

## 14.    TERM AND TERMINATION

**14.1 Term.** This Agreement shall be effective as of the Effective Date and shall continue in full force and effect until termination of the Franchise Agreement, unless earlier terminated in accordance with the terms and conditions of this Agreement ("**Term**").

**14.2 Breach.** If any one of the following events occurs, then to the extent permitted by applicable law, Franchisor shall have the right to immediately terminate this Agreement: (a) Franchisee fails to make any payment when due under this Agreement or the Franchise Agreement and such failure continues uncured for a period of thirty (30) days (provided that Franchisor shall provide Franchisee with at least seven (7) days' prior notice of such overdue amount); (b) Franchisee violates the privacy, security or confidentiality obligations set forth in this Agreement; (c) Franchisee breaches any other covenant, warranty or agreement under this Agreement, the Franchise Agreement or any other agreement between Franchisee and Franchisor or Franchisor's Affiliate and such failure continues uncured for a period of thirty (30) days after Franchisee is given written notice of such failure; (d) the SaaS Solution becomes inoperable by Franchisee's act or omission; or (e) Franchisee's Franchise Agreement expires or terminates for any reason.

**14.3 Suspension.** In addition to the right to terminate this Agreement, Franchisor may suspend Franchisee's access to the SaaS Solution upon the occurrence of any of the events described in Section 14.2 until Franchisee's violation is cured and Franchisee has agreed in writing to engage in no conduct that will cause a repeat violation to occur. If Franchisee violates such a restoration agreement, Franchisor may suspend or terminate Franchisee's access to the SaaS Solution permanently or for an indefinite period. Because Franchisor still incurs costs on Franchisee's behalf, Franchisee must continue to pay all fees associated with services under the Franchise Agreement during any such suspension period.

**14.4 Termination For Convenience By Franchisee.** Franchisee may terminate this Agreement for convenience at any time by providing Franchisor with not less than sixty (60) days' advance written notice.

**14.5 Termination For Convenience By Franchisor.** Franchisor may terminate this Agreement for convenience at any time provided that Franchisor shall provide Franchisee with no less than sixty (60) days' advance notice.

**14.6 Upon Termination.** Upon termination of this Agreement: (a) Franchisee's license granted under this Agreement ends and Franchisee shall immediately cease using the SaaS Solution; (b) Franchisee shall immediately cease using the Access Credentials that Franchisee was provided to access and use the SaaS Solution; and (c) Franchisee shall return the originals and all copies of non-owned Guest Information and other Confidential Information unencumbered to Franchisor within thirty (30) days after termination and certify to Franchisor in writing that the original and all copies have been returned. FRANCHISEE EXPRESSLY WAIVES ANY RIGHT TO NOTICE OF OR ANY HEARING WITH RESPECT TO REPOSSESSION AND CONSENT TO ENTRY INTO THE FACILITY BY FRANCHISOR'S AGENTS OR

9

SynXis
Q1/20

REPRESENTATIVES OR ANY PREMISES WHERE THE SAAS SOLUTION MAY BE LOCATED AND REMOVING IT WITHOUT JUDICIAL PROCESS. If Franchisee fails or refuses to permit the peaceable entry by Franchisor's agents to take possession of the SaaS Solution, Franchisee shall be liable for rental of the SaaS Solution at the rate of $500.00 per week from the date that Franchisor first attempts to retake the SaaS Solution. Franchisor may, in its sole discretion, embed within the SaaS Solution various security devices that will render the SaaS Solution unusable and the data stored by the Hardware or the SaaS Solution inaccessible if this Agreement terminates.

## 15.  NOTICES

**15.1  General.**  All notices and other communications in connection with this Agreement shall be in writing and shall be sent to the respective Parties at the addresses set forth below or to such other addresses as may be designated by each Party in writing from time to time in accordance with this section. All notices and other communications shall be sent by registered or certified air mail, postage prepaid, or by express courier service, service fee prepaid. All notices and other communications shall be deemed received: (a) immediately upon delivery, if hand delivered; (b) five business days after depositing in the mail, if delivered by mail; or (c) the next business day after delivery to express courier service, if delivered by express courier service.

| If to Franchisor: | If to Franchisee: |
|---|---|
| **TRAVELODGE HOTELS, INC.** | **Covington RE LLC** |
| 22 Sylvan Way | 2605 South Range Avenue, |
| Parsippany, NJ 07054 | Denham Springs, LA 70726 |
| Attn: SVP, Franchise Services | Attn: Bhagirath Joshi |
| | |
| **With a copy to:** | **With a copy to:** |
| Wyndham Hotel Group, LLC | |
| 22 Sylvan Way | |
| Parsippany, NJ 07054 | |
| Attn:  General Counsel | |

## 16.  MISCELLANEOUS

**16.1  Force Majeure.**  If performance by either Party is delayed or prevented (excluding the obligation to make payments under this Agreement) because of strikes, inability to procure labor or materials, defaults of suppliers or subcontractors, delays or shortages of transportation, failure of power or communications systems, restrictive governmental laws or regulations, weather conditions, or other reasons beyond the reasonable control of the Party, then performance of such acts will be excused and the period for performance will be extended for a period equivalent to the period of such delay.

**16.2  Entire Agreement.**  This Agreement and any attachments hereto, constitutes the entire, final and exclusive agreement and understanding of the Parties with respect to the subject matter hereof and supersedes all prior or contemporaneous statements, representations, negotiations, discussions, understandings and agreements, whether oral or written, with respect to the subject matter of this Agreement.  Nothing in the foregoing, no provision in this or any related agreement is intended to disclaim the express representations made in the Franchise Disclosure Document.

SynXis
Q1/20

**16.3 Franchisee's Forms.** Franchisor is not bound by any terms of Franchisee's purchase order forms or notices of acceptance which attempt to impose any conditions at variance with the terms and conditions of this Agreement or with Franchisor's invoices, standards manuals or technical specifications. Franchisor's failure to object to any provision contained in Franchisee's printed form is not a waiver of any provision of this Agreement.

**16.4 No Third Party Beneficiary.** The Agreement is intended for the sole benefit and protection of the named Parties, their successors and permitted assigns, and no Third Party shall have any cause of action or right to payments made or received herein except for any owners of any software who have licensed or authorized Franchisor to sublicense the same to Franchisee.

**16.5 Prevailing Party Attorneys' Fees.** In the event of an alleged breach of this Agreement, the prevailing Party shall be entitled to reimbursement of all of its costs and expenses, including reasonable attorneys' fees, incurred in connection with such dispute, claim or litigation, including any appeal therefrom. For purposes of this Section, the determination of which Party is to be considered the prevailing Party shall be decided by the court of competent jurisdiction that resolves such dispute, claim or litigation.

**16.6 Other Relief.** Franchisor may obtain the remedy of injunctive relief without the posting of a bond if Franchisee violates its obligations regarding confidentiality, non-disclosure, transfer or limitations on the SaaS Solution use under this Agreement. Notwithstanding anything contained in this Agreement to the contrary, each Party shall be entitled to seek injunctive or other equitable relief whenever the facts or circumstances would permit such Party to seek such equitable relief in a court of competent jurisdiction.

**16.7 Modifications.** This Agreement may not be amended, modified or rescinded except in writing, signed by both Parties, and any attempt to do so shall be void and of no effect. This Agreement may be modified or amended only pursuant to a separate writing mutually agreed upon and signed by both Parties. The Parties expressly disclaim the right to claim the enforceability or effectiveness of: (a) any oral modifications to this Agreement; and (b) any other amendments that are based on course of dealing, waiver, reliance, estoppel or other similar legal theory. The Parties expressly disclaim the right to enforce any rule of law that is contrary to the terms of this Section.

**16.8 Governing Law; Exclusive Jurisdiction.** The validity, construction and performance of this Agreement, and the legal relations among and any disputes between the Parties to this Agreement, shall be governed by and construed in accordance with the laws of the State of New Jersey, excluding that body of law applicable to conflicts of law that would apply the substantive law of another jurisdiction. Any suit or proceeding relating to this Agreement shall be brought only in the state and federal courts located in the State of New Jersey. The Parties hereby expressly consent to the exclusive personal jurisdiction of the New Jersey state courts situated in Morris County, New Jersey, and the United States District Court for the District of New Jersey. Each Party hereby waives any right it may have to assert the doctrine of forum non conveniens or to object to venue with respect to any suit or proceeding brought under this Agreement.

**16.9 Waiver.** If either Party fails to exercise any right or option at any time under this Agreement, such failure will not be deemed a waiver of the exercise of such right or option at any other time or the waiver of a different right or option. Termination of this Agreement by

11

SynXis
Q1/20

either Party will not waive Franchisee's obligation to make any payments to Franchisor under this Agreement.

**16.10 Headings.** The division of this Agreement into sections and the use of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "Agreement," "herein," "hereof," "hereunder" and similar expressions refer to this Agreement and not to any particular section or other portion hereof and include any Schedules or agreements supplemental hereto. Unless something in the subject matter or context is inconsistent therewith, references herein to sections are to sections of this Agreement.

**16.11 No Construction Against Drafter.** The Parties agree that any principle of construction or rule of law that provides that an agreement shall be construed against the drafter of the agreement in the event of any inconsistency or ambiguity in such agreement shall not apply to the terms and conditions of this Agreement.

**16.12 Counterparts.** This Agreement may be executed in one (1) or more duplicate originals, all of which together shall be deemed one and the same instrument.

**16.13 Severability.** If any provision of this Agreement is determined to be void or unenforceable, the provision shall be deemed severed from the Agreement and the remainder of this Agreement shall continue in full force and effect.

**16.14 Successors and Assigns.** This Agreement shall inure to the benefit of and be binding upon the Parties, their successors and permitted assigns. Notwithstanding the above, Franchisee may not assign this Agreement without Franchisor's express written consent.

**16.15 Mediation.** The Parties agree that all disputes arising under this Agreement or associated with the SaaS Solution may be submitted through non-binding mediation. Either party may request mediation which shall be conducted by a mutually acceptable and neutral third party organization. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

.

**16.16 Survival.** The provisions of this Agreement that due to their content should have continuing life shall survive the termination of this Agreement.

[*Signature Page Follows*]

12

**IN WITNESS WHEREOF**, the Parties hereto have executed, or caused to be executed by their duly authorized representatives, this Agreement as of the Effective Date.

| Franchisor | Franchisee |
|---|---|
| **TRAVELODGE HOTELS, INC.** | **Covington RE LLC** |

By: _Shilpan Patel_              By: _Bhagirath Joshi_

Name:   Shilpan Patel            Name   Bhagirath Joshi *

Title:   Senior Vice President, Franchise Services            Title: (Managing) Member

*By signing this Agreement you represent that you are authorized to enter into this Agreement on behalf the Franchisee named herein.

SynXis
Q1/20

## SCHEDULE 1.1

### Definitions

"**Access Credentials**" means any user name, identification number, password, license or security key, security token, PIN or other security code, method, technology or device used, alone or in combination, to verify End Users' identity and authorization to access and use the SaaS Solution.

"**Affiliate**" means any and all subsidiaries, affiliates, corporations, limited liability companies, partnerships, firms, associations, businesses, organizations, and/or other entities that directly or indirectly (either presently or in the future and/or through one or more intermediaries) control, are controlled by, or are under common control with, the subject entity (with respect to Franchisor, including Franchisor's parent company, Wyndham Worldwide Corporation) and/or such entities.

"**Communication Services**" means the Internet connectivity services Franchisee uses for purposes of accessing and using the SaaS Solution.

"**End User**" means a person who is authorized by Franchisor, or who is otherwise permitted under this Agreement, to access and use the SaaS Solution, including without limitation, Franchisee.

"**Facility**" means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the effective date of the Franchisee Agreement.

"**Franchise Agreement**" means the License or Franchise Agreement between Franchisee and Franchisor granting to Franchisee the non-exclusive right to operate the Facility under the System.

"**Guest Information**" means any names, e-mail addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including, without limitation, stay information, that either Franchisor or Franchisee or a person acting on behalf of one or both of them receives from or on behalf of the other or any guest or customer of the Facility or any other Third Party.

"**Hardware**" means the computer hardware, peripheral equipment, ancillary equipment, the operating system software and related documentation that Franchisee uses for purposes of accessing and using the SaaS Solution.

"**Intellectual Property**" means any and all rights existing from time to time under patent law, copyright law, trademark law, trade secret law, and any other proprietary rights laws and regulations as well as any related applications, reissuances, continuations, continuations-in-part, divisionals, renewals, extensions, and restorations thereof, now or hereafter in force and effect anywhere in the world.

"**Permitted Use**" means use of the SaaS Solution by End Users for the benefit of Franchisee solely in or for Franchisee's business operations as contemplated for and in accordance with the Franchise Agreement.

"**Services**" shall mean Additional Services, CRISP Services and Maintenance and Support Services.

"**System**" means the comprehensive system for providing guest lodging facility services under the Marks as Franchisor specifies which, at present, includes only the following: (a) the Marks; (b) other intellectual property including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity, and other promotional materials and programs; (d) System Standards; (e) training

14

programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

"**Third Party**" means persons and entities other than Franchisor and Franchisee.

15

## SCHEDULE 2.1

### The SaaS Solution

The SaaS Solution means the SynXis Property Management System, which as of the Effective Date includes the following features and functionality:

–   Web-based solution, which may include a local smart client
–   Community model hosting by Sabre Hospitality Solutions, or an affiliate thereof
–   Upon availability, we may also provide an interface with an automated rate audit system or create property-specific, unconstrained demand models or similar service.
–   In-system training materials

SynXis
Q1/20

## SCHEDULE 2.3

### Implementation Services

Franchisor will offer Implementation Services consisting of assistance in installation/implementation of the SaaS Solution including the following:

– Assistance with setup of two (2) Elavon tokenization terminals (to be provided in connection with execution of Elavon Agreement)

– Installation of SaaS Solution on a minimum of two (2) work stations for Facility's front desk (Hardware to be provided by Franchisee)

– Training modules regarding features and functionality of SaaS Solution, including video demonstrations and tutorials

– Remote and optional on-site resources including training of Facility's staff

SynXis
Q1/20

**SCHEDULE 4.2**

**CRISP Services**

**Terms of CRISP Services**

Franchisee agrees to establish the best available rate "**BAR**"; provided, however that Franchisee acknowledges and agrees that it will retain ultimate control over all rate audit decisions. Subject to the foregoing, Franchisee explicitly authorizes Franchisor to make adjustments to the Facility's rates, inventory and restrictions in order to comply with the Required Policies and Practices without advance notice to Franchisee. Franchisor shall not, however, change the BAR without authorization from Franchisee. In addition, Franchisee may modify or reverse any change Franchisor may make by notifying Franchisor, provided that such modification or reversal is consistent with the Required Policies and Practices. Franchisee's general manager shall be its primary representative who shall have the authority to make rate audit decisions for the Facility, unless Franchisee designates another Facility representative in writing to Franchisor. Franchisor may communicate with Franchisee's representative by telephone, e-mail or in another manner, and Franchisor may rely on any communication which Franchisor believes, in good faith, is from Franchisee's representative. Any know-how, algorithms, formulae, data, recommendations, documentation, software, or other materials or information that Franchisor furnishes to Franchisee in connection with the CRISP Services shall be deemed "Confidential Information" as defined in the Franchise Agreement and shall be subject to all prohibitions on disclosure, copying or use of Confidential Information under the Franchise Agreement.

**Overview of CRISP Services**

Property Audit & Setup

In consultation with the Facility representative, simplify rates and room type structures by:
- Verifying that all required rate plans are loaded correctly in the SaaS Solution;
- Verifying that local rates are available for sale in the distribution channels selected by the Facility;
- Verifying that all brand standard rate plans are available for sale; and
- Verifying that all hotel specific data is accurate and up to date in all systems.

Rate & Inventory Management

Review inventory/rate visibility and consistency across all distribution channels. Key services include:
- Monitoring Facility inventory and rate settings in the SaaS Solution;
- Identifying and advising Franchisee of erroneous rate plans;
- Monitoring rates across distribution channels and checking for accuracy in third party channels; and
- Coordinating participation in key corporate accounts and marketing programs.

18

SynXis
Q1/20

## SCHEDULE 4.3

### Maintenance and Support Services

**First Level of Support**

Franchisor will provide first-level support for the SaaS Solution, which shall include:

− SynXis Property Management System;

− Upon availability, the automated rate audit solution

− Any additional interfaces included in the SaaS Solution.

Additionally, Franchisor shall field initial inquiries related to the Elavon Non-SaaS Solution Services though support therefor shall be provided as set forth in the Elavon Agreement.

**Second Level of Support**

In the event first level support fails to resolve any maintenance or support issues for the SaaS Solution, Franchisor will provide second level support by putting Franchisee in contact with the appropriate Third Party provider of the SaaS Solution.

**Franchisee Obligations**

Franchisee shall perform all user-required maintenance procedures specified by the vendor of the specific Hardware components, and obtain required maintenance only from an authorized service provider.

SynXis
Q1/20

## SCHEDULE 5.1

**Fees**

| | |
|---|---|
| **With up to Three Interfaces\*** | $593.25 per month |
| **One-Time Start-Up Fee** | $3,400.00 |
| **Mobile Check-in Interface Fee** | $50.00 per month, once available |
| **Additional Interfaces\*** | $50.00 per month |
| **One-Time Transfer Fee (if applicable)** | $500.00 |

\* "**Interface**" means any interface you may choose to include, which may be necessary for features relating to, for example, voicemail, call accounting, etc. The Elavon tokenized credit card interface and, upon availability, an interface for an automated rate audit solution are included in the monthly price listed above and count towards the three interfaces described above.

20

SynXis
Q1/20

## **SCHEDULE 6.1**

### **Hardware Minimum Technical Specification Requirements**

1.  Windows 8.1 or Windows 10 version 1607 and above

2.  4GB+ of RAM (8GB recommended)

3.   2GHz processor or greater

4.  4.5GB+ Available Disk Space

5.  Microsoft .NET Framework Version 4.7.2

6.  Internet Explorer 11 or Firefox 73 must be set as the default browser on the SaaS Solution

7.  Screen resolution should be set to at least 1024x768

8.  Browser security settings using Transport Layer Security (TLS) 1.2

9.  To save/view reports Acrobat DC is required (or compatible pdf reader)

10. Elavon Fusebox connectivity from two way interface

11. Elavon imaged Ingenico Swipe devices with outbound access to Fusebox

12. Elavon Webapp access (manual processing pop-up window)

21

SynXis
Q1/20

## **SCHEDULE 7.1**

### **Mobile Operating Platform and Emergency Safety Device**

You may subscribe to the Mobile Operating Platform ("MOP") by Lodging Controls, Inc., a Third Party, for an additional Fee. If you subscribe to MOP, then you may also choose to add the Emergency Safety Device ("ESD") functionality of MOP for an additional Fee. To subscribe to MOP and, if applicable, the ESD functionality of MOP, check the box below and initial:

☐       Mobile Operating Platform           Initial: _____

☐       Emergency Safety Device          Initial: _____

**BY SUBSCRIBING TO MOP AND, IF APPLICABLE, TO THE ESD FUNCTIONALITY OF MOP, YOU AGREE:**

1. The definition of SaaS Solution in <u>Schedule 2.1</u> is amended to add the following:

A Mobile Operating Platform which includes the following features and functionality:

– A cloud-based software system that provides a work-flow solution to manage recurring and real-time tasks, such as property cleaning and maintenance

2. <u>Schedule 5.1 (Fees)</u> is amended to add the following:

| **Mobile Operating Platform** | $0.60 per room at the Facility, per month |
|---|---|
| **Emergency Safety Device (if applicable)** | $35.00 per month |

3. If you chose to add the ESD functionality of MOP, you acknowledge and agree that the ESD functionality of MOP is a Non-SaaS Solution under this Agreement and requires you to accept terms and conditions provided by a Third Party and our facilitation of the ESD with the SaaS Solution is an Additional Service only.

SynXis
Q1/20

# EXHIBIT C

**Signature Reservation Services Agreement**

**Franchisee: Covington RE LLC  ("you" or "your")**
**Brand: Travelodge**
**Property Location: Denham Springs, LA ("Property")**
**Account Number: 55072-16502-02**

Wyndham Hotel Group, LLC ("we", "us" or "our"), through third-party vendors, has developed two services, Digital Search Call Transfer ("DSCT") and Property Call Transfer ("PCT"), under which callers inquiring about reservations at franchised properties may have their calls handled by our reservation agents ("Agents") who will book reservations on your behalf (each of DSCT and PCT a "Service" and, collectively, "the Services").

The Services are described in more detail in Schedule A (DSCT) and Schedule B (PCT) to this Agreement. To participate in PCT you must satisfy, in our sole discretion, certain technology and resource requirements specified in Schedule B. **You acknowledge that, in the event you choose to participate in the PCT Service but fail to satisfy our requirements for that Service, including by failing to transfer a reasonable volume of calls in good faith to our reservation agents during the Term, you shall be enrolled automatically to participate in the DSCT Service.**

Subject to satisfying our requirements, if applicable, indicate which of the Services you wish to participate in by checking the appropriate box below:

☒       Digital Search Call Transfer (Schedule A)

☐       Property Call Transfer (Schedule B)

Regardless of whether you participate in DSCT or PCT, or any other additional or replacement Service we may introduce during the Term, you agree to participate in the applicable Service in accordance with the following:

**1.**    **Fees.**  Beginning on the "Billing Commencement Date", we will charge you a "Call Transfer Fee" as reflected on Schedule A or Schedule B, as applicable.  The Billing Commencement Date is the date that our Agents book the first room reservation at your Property.  We will invoice you monthly for the Call Transfer Fees which shall be payable when your Royalties are due under your franchise or membership agreement with us.  We may, in our discretion, increase the Call Transfer Fee to cover our costs provided such fees are increased for all similarly situated Properties. We shall notify you no less than thirty (30) days prior to any such increase taking effect.

**2.**    **Term.**  This Agreement will begin when we countersign this Agreement after you sign it and will continue until the expiration or termination of your franchise or membership agreement with us or our affiliate. In addition, we shall have the right to terminate this Agreement at any time without cause upon thirty (30) days' written notice.

1

SRS
Q3/20

3.      **Change to Services.** We reserve the right to amend, cancel, or replace any of the Services as business circumstances warrant, in our sole discretion, upon 30 (thirty) days' written notice. In the event that we cancel any Service in which you are then currently participating, then we may, at our option, replace the Service with an alternative Service or require you to participate in another Service then currently offered under this Agreement.

4.      **Dispute Resolution.** Any disputes arising under this Agreement will be resolved in accordance with the dispute resolution procedures under your franchise or membership agreement with us or our affiliate, including but not limited to, the provisions concerning waiver of jury trial, consent to venue and personal jurisdiction, and choice of law.

5.      **No Warranty.** WE MAKE NO REPRESENTION OR WARRANTY REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT THE PROPERTY WILL ATTAIN AS A RESULT OF THE SERVICE OR THAT YOUR RESERVATIONS OR REVENUE WILL INCREASE. WE MAKE NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, REGARDING THE SERVICE. YOU, ON BEHALF OF YOURSELF, YOUR SUCCESSORS AND ASSIGNS, HEREBY WAIVE, RELEASE AND RENOUNCE ALL CLAIMS OR CAUSES OF ACTION THAT YOU MAY HAVE AGAINST US, OUR AFFILIATES, OR OUR OR THEIR OFFICERS, DIRECTORS OR AGENTS, ARISING OUT OF THE SERVICES, UNLESS DUE TO OUR WILFULL MISCONDUCT.

6.      **Limitation on Liability.** NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR INDIRECT DAMAGES, INCLUDING, BUT NOT LIMITED TO, LOST PROFITS OR LOST REVENUE (COLLECTIVELY REFERRED TO AS "INDIRECT DAMAGES") ARISING FROM, RELATING TO, OR IN CONNECTION WITH THE SERVICE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF OR COULD HAVE FORESEEN SUCH DAMAGES. IN ADDITION, EACH PARTY'S DIRECT DAMAGES (AND ANY INDIRECT DAMAGES TO THE EXTENT THAT A COURT OF COMPETENT JURISDICTION OR OTHER AUTHORITY DOES NOT RECOGNIZE OR ENFORCE THE ABOVE WAIVER) SHALL BE LIMITED TO THE TOTAL FEES PAID BY YOU TO US DURING THE THEN CURRENT TERM.

7.      **Force Majeure.** In no event shall either party be liable for any failure or delay in performance (except for the obligation to remit fees) due to causes or circumstances beyond its reasonable control and without its fault or negligence (including, but not limited to, Acts of God, acts of the public enemy, war or terrorism, acts of the United States of America, or any state, territory or political division of the United States of America, or of the District of Columbia, fires, floods, or other natural disaster, strikes or any other labor disputes, communication line failures, and/or freight embargoes).

8.      **Miscellaneous.** The parties agree that this Agreement contains the entire agreement between the parties relating to the Services, superseding and terminating any prior representation,

2

SRS
Q3/20

warranty or agreement, whether oral or in writing.  Nothing in this or any other related agreement, however, is intended to disclaim any representations we made in the Franchise Disclosure Document that we or our affiliate furnished to you.  No modification, amendment or waiver of this Agreement will be binding upon either party unless the same has been made in writing and executed by both parties.  This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties.  You may not assign this Agreement without our prior written approval.  All facsimile executions shall be treated as originals for all purposes.

**ONLY AN AUTHORIZED REPRESENTATIVE OF THE PROPERTY SHOULD SIGN THIS AGREEMENT.  BY SIGNING THIS FORM,** you represent that you agree to the above terms and that you are authorized to bind the Property.

WE/FRANCHISOR:

By: _Shilpan Patel_
    69D9CAC798BF412...
Name:  Shilpan Patel
Title:  SVP, Franchise Services
Execution Date: _December 21, 2020_

YOU/PROPERTY:

By: _Bhagirath Joshi_
    Bhagirath Joshi
Name: _Bhagirath Joshi_
Title: _____

3

SRS
Q3/20

**Schedule A**
**Digital Search Call Transfer**

1.          **Our Responsibilities.**  We will:

(a) Hire and train Agents at our Central Reservation Center to handle reservation calls on behalf of your Property, including responding to questions about your Property and attempting to book reservations at your Property.  The goal is for the transfer to our Central Reservation Center to appear seamless to the customer and that our Agents appear as an extension of your hotel staff.

(b) Through our third-party vendor, provide a new, dedicated telephone number for your Property to appear on search engines and other digital platforms which will connect to an Interactive Voice Response.  Callers to this telephone number will be able to select a number for reservation inquiries.  All reservation inquiry calls will be directed to our Central Reservation Center.  We will own the telephone number and you must cease all use of it when your participation in the Service ends.  You may not use the telephone number in any advertising or marketing materials or on any websites without our prior written approval.

2.          **Your Responsibilities.**  You will be responsible for:

(a) Working with our team to verify that your Property information, including Property description, address, amenities, inventory, and all other content is updated and accurate in our Central Reservation System at all times.

3.          **Fees.**  The Call Transfer Fee is 3.5% of the Gross Room Revenue ("GRR") for each reservation booked by us, up to a maximum of $7.00 (seven dollars) per reservation booked.

.

4

SRS
Q3/20

**Schedule B**
**Property Call Transfer**

1.        **Our Responsibilities.**  We will:

(a) Hire and train Agents at our Central Reservation Center to handle reservation calls on behalf of your Property, including responding to questions about your Property and attempting to book reservations at your Property.  The goal is for the transfer to our Central Reservation Center to appear seamless to the customer and that our Agents appear as an extension of your hotel staff.

(b) Provide you with a dedicated toll-free telephone number for transferring Qualified Calls (as defined below) to the Central Reservation Center.  We will own the toll-free number and you must cease all usage of it when your participation in the Service ends.  You may not disclose the toll-free number to any person except your staff on a need to know basis and you may not use it in any advertising or marketing materials for the Property.

2.        **Your Responsibilities.**  You will be responsible for:

(a) Installation, at your cost, of any PBX hardware and software necessary to interface with the Central Reservation Center.  You may also install, at your option and cost, an interactive voice response or "auto-attendant" system at the Property.

(b) Providing sufficient technology or people at the Property, in our sole discretion, to pre-qualify callers before transferring them to the Central Reservation Center.  You will only transfer calls from guests who express an interest in reservations at your Property.  If you utilize an auto attendant system at the Property, you will designate one key function for reservation information for the property, and you will only transfer these self-selected guests to the Central Reservation Center.  These kinds of calls are referred to as "Qualified Calls."

(c) Transferring, in good faith, a reasonable volume of calls to our Central Reservation Center. If we determine, in our reasonable discretion, that you are not forwarding calls to the program in good faith, you shall be enrolled into the DSCT service.

3.        **Fees.**  The Call Transfer Fee is 3.5% of the Gross Room Revenue ("GRR") for each reservation booked by us, up to a maximum of $7.00 (seven dollars) per reservation booked.  In the future, we reserve the right to modify the Call Transfer Fee for the PCT Service such that you will be required to pay a reasonable Call Transfer fee for each call forwarded by your Property to our Agents. We will provide written notice of any such change.

SRS
Q3/20

# EXHIBIT D

4

## GUARANTY

To induce TRAVELODGE HOTELS, INC., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments,  will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement.  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee.  We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, and Dispute Resolution and WAIVER OF JURY TRIAL applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

**GUARANTORS:**

DocuSigned by:

*Bhagirath Joshi*

6A2619E8F91D43C

Name:  Bhagirath Joshi
Address: 23911 Terrace Ave.
Denham Springs, LA 70726

TRA EX-C1
Q1/20

# EXHIBIT E

![Wyndham Hotels & Resorts]

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

August 19, 2024

**VIA ELECTRONIC MAIL AND UPS**
kishane@kjpcounsel.com

Mr. Kishane J. Patel, Esq.
KJP Counsel, PLLC
8180 Pensacola Blvd.
Suite 200
Pensacola, FL 32534

**RE:     ACKNOWLEDGMENT OF TERMINATION** of the Franchise Agreement for Travelodge® by Wyndham Unit #55072-16502-02 located in Denham Springs, LA (the "Facility")

Dear Mr. Patel:

Travelodge Hotels, Inc. ("we" or "us") has received your email dated June 27, 2024, advising us that on August 5, 2024 (the "Termination Date"), Covington RE LLC (the "Franchisee") stopped operating the Facility as a Travelodge facility.  Accordingly, we acknowledge that the Franchise Agreement, dated December 21, 2020 (the "Agreement") has terminated.

The Agreement requires the Franchisee to perform certain post-termination obligations.  In addition to other obligations specified in the Agreement, by no later than ten (10) days from the delivery date of this letter, the Franchisee must (a) remove all signage and other items bearing the Travelodge Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as Travelodge facility; and (d) remove the Travelodge Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines.  The Franchisee must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified.  The Franchisee must immediately return to us all training documents, operating manuals and other proprietary material.

At this time, we remind you that because the Agreement has terminated, the Franchisee must pay us Liquidated Damages of $92,000, as specified in Section 12.1 of the Agreement.  The Franchisee must also pay any outstanding Recurring Fees and any other fees and charges through the date Franchisee completes the de-identification of the Facility.  We estimate that, as of the date of this letter, the Franchisee owes us $3,159.82 in such fees and charges.  We have enclosed an itemized statement detailing the Recurring Fees and other charges.  Please direct your client to pay us these amounts within fourteen (14) days.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to Franchisee's Guarantor.

Please know that, because the Agreement has terminated, the Franchisee has also lost the right to continue to use the seamless interface version of the property management system.  The Franchisee must now make arrangements with the software vendor for a new license to use the property management system.  Please be advised that due to the termination, the Franchisee will have no functionality from the system.  If the













Facility has a SynXis system installed and the Franchisee wishes to continue using an independent version of the software, the Franchisee may contact Sabre at 877-520-3646.  If the Facility has an Opera system installed and the Franchisee wishes to continue using an independent version of the software, the Franchisee may contact Brad Eckensberger at 214-914-8855.  Further, the Franchisee has also lost access to additional accounts, such as Oracle Hospitality Integration Platform (OHIP) and Reporting and Analytics (R&A).  Please see the enclosed Opera Cloud Termination – PMS Best Practices for next steps.  If the property is planning to migrate to another property management system, the Franchisee may contact its provider to expedite the installation.  If the Franchisee would like to inquire about the data maintained in the system, the Franchisee may contact Hotel Technology Client Support at 506-646-2504 to obtain reporting of that data.

Should you or the Franchisee have any questions regarding this matter, please contact Kelly Krug, Vice President, Litigation at (973) 753-6757 or at Kelly.Krug@wyndham.com.

Sincerely,

Suzanne Fenimore
Vice President
Contracts Compliance

Enclosures

cc:      Bhagirath Joshi (Site Principle and Guarantor) - 23911 Terrace Ave., Denham Springs, LA 70726
         bjoshi@rocketmail.com
         Shilpan Patel
         Stephanie Kendrick
         Kelly Krug, Esq.
         Joe Maida
         Dawn Whitley

Covington RE, LLC
2311 Home Depot Dr.,
Denham Springs,
LA 70726, United States



**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

Travelodge Hotels, Inc.
22 Sylvan Way
Parsippany, NJ ,07054

Payment Terms: 30 Days from date of invoice          Account Number   55072-16502-02-TRA          Statement as of: 05-AUG-2024

| Period | Invoice Date | Invoice Number | Invoice Description | Amount Billed (USD) | Tax | Finance Charges | Amount Applied/ Credited | Adjustment | Total (USD) |
|---|---|---|---|---|---|---|---|---|---|
| JUL-24 | 07/01/2024 | 31017888 | SIGNATURE RESERVATION SERVICE | 13.86 | 0.00 | 0.00 | 0.00 | 0.00 | 13.86 |
| | 07/02/2024 | TD3324730 | DIGITAL PFP | 69.73 | 0.00 | 0.00 | 0.00 | 0.00 | 69.73 |
| | 07/23/2024 | 33176154 | GDS INTERNET CONNECTIVITY FEE June 2024 | 152.25 | 0.00 | 0.00 | 0.00 | 0.00 | 152.25 |
| | 07/26/2024 | 27200237 | WYNDHAM REWARDS 5% | 729.50 | 0.00 | 0.00 | 0.00 | 0.00 | 729.50 |
| | 07/26/2024 | 27201061 | WYNREWARDS 5% DISCOUNT: 0.75% | -83.30 | 0.00 | 0.00 | 0.00 | 0.00 | -83.30 |
| | 07/26/2024 | 27201062 | WYNREWARDS ENROLLMENT FEE CR | -175.04 | 0.00 | 0.00 | 0.00 | 0.00 | -175.04 |
| | 07/31/2024 | 46438338 | Actual-ROYALTY FEE | 1,470.20 | 0.00 | 0.00 | 0.00 | 0.00 | 1,470.20 |
| | 07/31/2024 | 46438339 | Actual-SYSTEM ASSESSMENT FEE | 326.71 | 0.00 | 0.00 | 0.00 | 0.00 | 326.71 |
| | 07/31/2024 | 46424215 | SYNXIS PM SUPPORT | 621.00 | 0.00 | 0.00 | 0.00 | 0.00 | 621.00 |
| | | | **Total JUL-24** | **3,124.91** | **0.00** | **0.00** | **0.00** | **0.00** | **3,124.91** |
| AUG-24 | 08/01/2024 | 31017953 | SIGNATURE RESERVATION SERVICE | 2.59 | 0.00 | 0.00 | 0.00 | 0.00 | 2.59 |
| | 08/02/2024 | TD3331936 | DIGITAL PFP | 26.24 | 0.00 | 0.00 | 0.00 | 0.00 | 26.24 |
| | 08/02/2024 | TM3331936 | MEMBER BENEFIT COMMISSION | 5.29 | 0.00 | 0.00 | 0.00 | 0.00 | 5.29 |
| | 08/02/2024 | TC3331936 | TA COMMISSION SERVICE CHARGE | 0.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.79 |
| | | | **Total AUG-24** | **34.91** | **0.00** | **0.00** | **0.00** | **0.00** | **34.91** |
| | | | **Total Outstanding:** | **3,159.82** | **0.00** | **0.00** | **0.00** | **0.00** | **3,159.82** |



Travelodge Hotels, Inc.
22 Sylvan Way
Parsippany, NJ ,07054

**PAYMENT OPTIONS**

**BY WIRE TRANSFER**: Please ensure all transfers costs are settled by yourselves. Please quote the invoice and account number with payment and transfer to:

| | | |
|---|---|---|
| Bank | : | Bank of America, N.A. |
| Branch Address | : | 100 West 33rd Street New York NY 10001 |
| Account Name | : | Travelodge Hotels, Inc. |
| Bank Account Number | : | 4426450861 |
| ABA | : | 026009593 |
| Swift Code | : | BOFAUS3N |

**REMIT CHECKS TO:**

Travelodge Hotels, Inc.
15022 Collections Center Drive
Chicago, IL 60693

**GO GREEN: PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

**Additional Information:**

Thank you in advance for your prompt payment and continued business
Please note accrual invoices on your account are estimates and can't be paid until actual revenues are reported
Please ensure you promptly submit your actual revenues and rooms sold in Wynpay

**Contact information:**

For supporting invoice details please visit WynPay and/or Wyndham Community.  For questions please call 1-855-849-3487 or email Financial.Services@wyndham.com

| Billing Glossary | |
| --- | --- |
| **Catcode Description** | **Long Description** |
| DIGITAL PFP | Commissions related to bookings that are part of the digital pay for performance (DPFP) program.  The DPFP is a program designed to reinvest funds into our digital media program to deliver direct bookings to our franchisees.  DPFP-eligible channels include Paid Search, Meta, Feeds, Display, Local, and Facebook Retargeting.  Please Note: The DPFP commission is not charged on every digital media driven booking.  For example, bookings through select member benefits programs (e.g. AAA and AARP) as well as bookings by Platinum, Diamond, and Titanium rewards members, are not charged.  For questions please contact central.commissions@wyndham.com. |
| GDS INTERNET CONNECTIVITY FEE | GDS & Internet Connectivity Fees are charged per consumed booking based on the fees outlined in your agreement or subsequent communication. No GDS and internet connectivity fees are due on cancelled or no-show reservations provided they are updated in the reservation system.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Finance" category. For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487 |
| MEMBER BENEFIT COMMISSION | Commissions related to Global Sales member benefits program.  The Member Benefits Program establishes partnerships with member loyalty and affinity based organizations by providing those organizations' with a proprietary discount. Accounts include but are not limited to AARP, American Legion, Wyndham Destinations, American Farm Bureaus to name a few. This program is used to help keep WHR top of mind with these organizations in order to drive revenue through Wyndham Direct channels.  Backup for this invoice can be located in Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| ROYALTY FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement.  For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| SIGNATURE RESERVATION SERVICE | Fee for hotels on the Signature Reservation Services (SRS) call transfer program that allows hotels to have reservation calls handled by our contact center reservation representatives. SRS fees are based on the booking only.  If no reservation is made, there is no cost to you.  On each reservation made, the fee is a % of GRR or a maximum fee (both outlined in the agreement), whichever is less. Backup for this invoice can be found at the following location Wyndham Community-> Hotel Management -> Reports and filter for "SRS" category.  For questions related to this invoice please contact the Signature Reservation Services team at srs@wyndham.com |
| SYNXIS PM SUPPORT | A fee for HTCS first level support services as detailed in your property management system agreement.  For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| SYSTEM ASSESSMENT FEE | Recurring  fee for the advertising and marketing activities of the system, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| TA COMMISSION SERVICE CHARGE | A 1.5% commission service charge based on total commissionable revenue processed for the given month.  Supporting detail for this invoice can be found on your travel agent commission invoice backup that can be located in Wyndham Community-> Hotel Management -> Reports -> filter for "Finance".  For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| WYNDHAM REWARDS 5% | Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNREWARDS 5% DISCOUNT: 0.75% | The Wyndham Rewards Loyalty Program assesses a 5% fee on all nights for which members earn points.  This Discount is for hotels that achieved 201%+ of their Quarterly Valid Enrollment Target during the prior quarter. This means the net Loyalty Program Charge for this quarter is 4.25%. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |
| WYNREWARDS ENROLLMENT FEE CR | A credit is applied towards the Loyalty Program Charge for all new Member Enrollment Stays.  Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category.  For questions related to the credit, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |

**DE-IDENTIFICATION PROCEDURES**

**You must complete each of the following within 10 days after the Termination Date:**

1.      Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Travelodge Marks.

2.      Remove all interior signage that contains Travelodge Marks.

3.      Change advertising billboards to remove Travelodge Marks, including any department of transportation or other highway signage.

4.      Stop answering Facility telephone as a Travelodge facility.

5.      Remove Travelodge name and Marks from any domain name, advertising and brochures.

6.      Return to us or destroy all confidential operations and training manuals.

7.      Remove the Travelodge name and Marks from the following items:

- Guestroom supplies including door signage, ice buckets, cups etc.
- Bathroom supplies including soap, shampoo, conditioner, etc.
- Business cards and letterhead
- Registration cards, folios, guest receipts, including electronic copies
- Guestroom keys
- Uniforms and name badges

8.      Paint over or remove any distinctive Travelodge trade dress, paint schemes or architectural features.

9.      Remove Travelodge name from the Facility's listing on TripAdvisor or any other online traveler review site.

10.     It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Travelodge facility.

11.     We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

# Opera Cloud Termination- PMS Best Practice

Important retrieval recommendations prior to termination of the Opera Cloud PMS.



**WYNDHAM**
HOTELS & RESORTS

 **WHAT YOU NEED TO KNOW:**

This document details a list of reports and information that we recommend be generated and retrieved from Opera Cloud *before your property is terminated*.

These files can be stored locally.  It *is very important* to store *back-up copies* of any files you retrieve; otherwise you will run the risk of losing this data.

Opera Cloud property management system access will be disabled on the day of termination. Users will also lose access to Oracle Hospitality Integration Platform (OHIP) and Reporting and Analytics (R&A) accounts. This is why we highly recommend you retrieve a copy this information for your future reference.

All of the reports can be e-mailed or saved locally.  Please be aware of the notes listed for each report, and ensure any questions you may have regarding this are answered *well prior to your termination* to avoid last minute issues or confusion.

## REPORTS TO PULL FROM OPERA CLOUD:

| Report Name: | Report Name: | Notes: | |
|---|---|---|---|
| A/R Activity – All Types | aractivity | | ☐ |
| AR Detailed Aging | aragingdet | | ☐ |
| Arrivals:Detailed | res_detail | This will show all future reservations. | ☐ |
| Arrivals:Detailed | res_detail | Enter past dates to see all past reservations. | ☐ |
| Block Information | resblkinfo | Enter Future and Past Dates | ☐ |
| Credit Card History | creditcard_history | This does not show the full credit card number | ☐ |
| Day/MTD/YTD Statistics | stat_dmy_seg | Pull for each month in the past.  Filters Rate Code/Rate Code | ☐ |
| Detailed Folio | Folio_details | | ☐ |
| Financial Payments & Revenue | findeptcodes | Will show Day, MTD and YTD financial numbers | ☐ |
| Guests by Tax Type | taxexempt | | ☐ |
| History and Forecast | history_forecast | | ☐ |
| Journal by Cashier&Trans Code | finjrnlbytrans | Detailed financial Postings | ☐ |
| Journal by Cashier&Article | finjrnl_articles | | ☐ |
| Master List – Detail | ardirectdet | Detailed information on AR Accounts | ☐ |
| Membership Stays | loyalty_member_stay | Select ALL filters. | ☐ |
| Profile Address | pr_address | Check Past Stays only. This could be a very long report.  Run Profile Types individually. | ☐ |
| Profile Notes | pr_notes | | ☐ |
| Profile Production Statistics | profileproductivitystat | | ☐ |
| Reservation Cancellations | rescancel | | ☐ |
| Reservation Statistics | res_statistics2 | Ability to show Market Code, Rate Code etc. Would need a separate report for each month. | ☐ |
| Restricted List | pr_restricted | | ☐ |
| Restrictions Detail | raterest | Ability to pull past restrictions | ☐ |
| Tax Exempt | taxexempt_02 | | ☐ |

## ✚ ADDITIONAL USEFUL INFORMATION TO RETRIEVE:

In addition to the reports above, the following may also be useful.  It is also recommended that you retrieve this information for your future reference.

- Accounts Receivables Statements/Invoices
  - The path to this in Opera Cloud is: Financials> Accounts Receivables> Batch Statements. Ensure Print Invoices is checked before processing.
  - It is recommended to check 'Print Zero Balances' and 'Include Previously Printed Statements'.
  - Then click on Process Statements.

## ◉ KEEP A BACKUP

After you have retrieved this information, it is recommended that you keep more than one copy of this data in more than one location to avoid losing it in the future.

